CARLOS A. MÁRQUEZ, JR., demandante y recurrido, *v.* AURELIO TORRES CAMPOS, demandado y recurrente.

*Número:* R-79-101 *Resuelto:* 18 de enero de 1982

*Aurelio Torres Campos,* recurrente, *pro se; Marcos A. Ramírez Lavandero,* de *Ramírez & Rivera,* abogado del recurrido.

El Juez Asociado Señor Martín emitió la opinión del Tribunal.

El demandado Aurelio Torres Campos poseía un hato de reses que mantenía en parte de una finca que tenía arrendada en Canóvanas. En 11 de abril de 1975, dichas reses fueron puestas en cuarentena, previa inspección, por autoridades estatales y federales, al hallarse presente el germen de tuberculosis en algunas de dichas reses. La notificación de la cuarentena ordenaba lo siguiente:

> Se le prohíbe a usted mover ganado alguno de sus terrenos bajo cuarentena a menos que sea autorizado por escrito por un veterinario del Departamento de Agricultura del Estado Libre Asociado de Puerto Rico o de los Estados Unidos.

Con posterioridad al 11 de abril de 1975 y hasta el 23 de septiembre siguiente, la finca del demandado fue objeto de varias inspecciones llevadas a cabo por veterinarios de las agencias federales y estatales concernidas, obteniéndose resultados positivos del germen de la tuberculosis en todas las inspecciones. Como consecuencia de ello, varias novillas del demandado fueron sacrificadas por los funcionarios gubernamentales. El demandado estuvo presente en todas las inspecciones y sacrificios.

No obstante tener conocimiento de la anterior prohibición desde el 11 de abril de 1975, el demandado autorizó a los Sres. Juan Saldaña y Zenén Domínguez, quienes tra-

bajaban para él, en algún momento entre el 11 de abril y el 26 de agosto de 1975, a trasladar parte de su hato de la referida finca en Canóvanas a una finca nombrada "Martín González" que el Sr. Saldaña tenía arrendada en Carolina, todo ello sin haber obtenido la autorización gubernamental que era imprescindible. También autorizó a Domínguez a gestionar la venta de dicho ganado.

Posteriormente Domínguez se comunicó con el demandante Márquez, quien tenía un negocio pequeño de crianza de ganado e interesaba aumentar la escala de su negocio, y le ofreció en venta unas cabezas de ganado. El mediador Domínguez y el prospecto comprador —el demandante en este caso— visitaron la finca "Martín González". Puesto que llovía fuertemente al llegar a la finca, no pudieron desmontarse, pero desde la guagua del demandante, pudieron observar como 30 cabezas de ganado pasearse de un lado a otro. Domínguez y el comprador Márquez acordaron que éste compraría veinticinco (25) novillos de ocho a nueve arrobas de peso cada uno, a razón de $29.00 la arroba. Convinieron reunirse el 23 de septiembre de 1975 (la cuarentena regía desde abril 11) en la romana de Ferdinand Morales en Río Grande para pesar el ganado y perfeccionar la transacción.

El tribunal de instancia determinó que dicho día 23 el demandante se dirigió directamente a Río Grande y allí se encontró con el demandado Torres Campos y sus acompañantes.[1] Luego de realizar el pesaje y calcularse el precio a pagar, el demandante Márquez entregó al demandado un cheque por la cantidad establecida ($5,234) perfeccionándose y consumándose el contrato de compraventa de 25 novillos. El tribunal de instancia también concluyó que en ningún momento el demandado Torres Campos advirtió al comprador demandante —personalmente o

---

[1] Rechazó el tribunal los testimonios ofrecidos por testigos del demandado en el sentido de que el demandante se encontró con ellos en Carolina y habían ido juntos a Río Grande, por estimarlos inconsistentes y faltos de credibilidad.

a través de otros— que el ganado provenía de un hato que estaba en cuarentena por tuberculosis. Tampoco el demandado tramitó la autorización requerida de las autoridades gubernamentales para el movimiento de ganado vendido. Igualmente concluyó el tribunal que a pesar de que el demandante había venido dedicándose a la crianza de ganado en pequeña escala por cerca de 5 años, nunca se había enfrentado a, ni estaba relacionado con el procedimiento de cuarentena.

El demandante trasladó el ganado adquirido del demandado a una finca llamada "La Yeyesa" en Salinas, finca que aquél había comprado en ese mismo año de 1975 conforme a su propósito de incrementar su negocio de crianza. Al momento de llevar allí el ganado, Márquez tenía en la finca más de un centenar de cabros que compró tan pronto adquirió la finca.

Posteriormente el demandante Márquez compró ochenta (80) novillos importados de la Florida por los cuales pagó $20,800. Estos novillos habían sido inspeccionados por los veterinarios del gobierno federal antes de salir de Florida y encontrados libres de tuberculosis. Antes de octubre de 1975 el demandante llevó los novillos a la finca "La Yeyesa", donde estaban los otros veinticinco (25) que había comprado del demandado.

A mediados de octubre de 1975, mes siguiente al de la compra, el demandante fue informado de que había tuberculosis en el ganado adquirido del demandado. Inmediatamente se comunicó por teléfono con la División de Veterinaria del Departamento de Agricultura local para inquirir sobre ello, y habló con el Dr. Negrón Ramos quien le confirmó que el ganado del demandado provenía de una finca que estaba en cuarentena y que, por tanto, todo el ganado que tenía el demandante en "La Yeyesa" debía ser inspeccionado a la mayor brevedad.

Del 4 al 7 de noviembre se llevó a cabo la primera inspección por autoridades federales y locales encontrán-

dose una cabeza contagiada. Esta tenía una pantalla de identificación indicativa de que provenía de la finca del demandado y que en una inspección anterior había sido encontrada sana. El animal fue sacrificado. Pudieron identificar además otras cinco (5) reses provenientes de la finca del demandado a través de sus respectivas pantallas de identificación. En una segunda inspección realizada del 1 al 5 de marzo de 1976 se encontraron dieciséis (16) cabezas contagiadas. Otras cuatro (4) fueron halladas en una tercera inspección llevada a cabo del 11 al 14 de mayo de 1976. Todas fueron sacrificadas, teniendo Márquez que incurrir en gastos por la cantidad de $1,160. Transcurrido algún tiempo durante el cual se estuvo debatiendo y gestionando el asunto entre el demandante y el Departamento de Agricultura, el gobierno pagó a Márquez $7,934 por los animales sacrificados.

Desde la primera inspección de la finca del demandante entre el 4 y 7 de noviembre, quedó puesta en cuarentena por haber allí ganado proveniente de la finca del demandado que ya estaba en cuarentena. En consecuencia, se le prohibió al demandante mover ganado o cualquier otro animal de su finca "La Yeyesa".

En agosto de 1976, diez meses después del hallazgo de la tuberculosis en su finca, Márquez obtuvo autorización para despoblarla. Vendió setenta y siete (77) cabezas por $13,620 y recibió además del gobierno cien (100) dólares de compensación por cabeza para un total de $21,320. Expertos tasadores (dos del Gobierno y uno del demandante) estimaron que el valor de esas cabezas era de $28,728. Durante ese tiempo murieron o desaparecieron otras siete (7) cabezas. Los cabros que tenía en la finca tuvieron que ser vendidos en $1,800 y unas gallinas que allí había fueron sacrificadas.

Por orden del gobierno la finca se mantuvo despoblada por tres meses. Al levantarse la cuarentena en enero de

1977 y con el propósito de evitar un nuevo brote de tuberculosis la finca quedó sujeta a regulaciones e inspecciones periódicas por el término de ocho (8) años.

No fue hasta cerca de agosto de 1976, más o menos al comenzar la controversia con el gobierno respecto al derecho a compensación por los animales sacrificados y transcurridos diez meses desde que se descubrió en su finca el germen de la tuberculosis, que el demandante se comunicó con el demandado para informarle sobre los problemas que estaba teniendo respecto al ganado que le había comprado. Finalmente, el 30 de agosto de 1976 el demandante Márquez instó una demanda contra Torres Campos en la que alegó que la actuación dolosa —o en la alternativa, negligente— del demandado al venderle ganado contaminado con tuberculosis, le había causado daños consistentes en (1) la pérdida del valor de sus reses, cabros y gallinas, (2) ganancias dejadas de devengar al no poder dedicar la finca a la actividad productiva que se proponía, (3) daños mentales y otros.

En 16 de diciembre de 1976 el demandado presentó una moción de desestimación en la que invocaba la prescripción de la acción del demandante por constituir una reclamación por saneamiento, que debía instarse dentro de los 40 días después de la terminación de la compraventa, o, por lo menos, desde la fecha en que el demandante tuvo conocimiento de la "alegada" cuarentena. En la alternativa alegó que la acción apropiada hubiera sido la de rescisión, y que en última instancia la acción por vicios ocultos también estaba prescrita por el transcurso de seis meses. La moción de desestimación fue denegada. Celebrada la vista en su fondo los días 9, 10 y 11 de octubre de 1978, se dictó la sentencia objeto de este recurso el 12 de enero de 1979 que declaró con lugar la demanda, condenó al demandado a pagar $34,525 por daños, más costas y honorarios, y declaró sin lugar la reconvención por embargo ilegal que

había incoado éste. El demandado solicitó determinaciones adicionales de hecho y reconsideración de la sentencia. Ambas peticiones fueron declaradas sin lugar.

El demandado presentó oportunamente Recurso de Revisión ante nos, el cual declaramos sin lugar. Luego decidimos acoger una Moción de Reconsideración y expedimos el auto para revisar. Un examen detenido y cuidadoso de los autos en instancia, de los documentos que obran en autos y de los alegatos de las partes, a la luz de las disposiciones de ley aplicables y la doctrina que pasamos a analizar, nos ha dejado convencidos de que debe confirmarse la sentencia recurrida.

## I

La alegación esencial del demandado recurrente es que la acción de saneamiento por vicios ocultos en animales que debe entablarse dentro de los 40 días de la transacción de compraventa es exclusiva e impide al comprador entablar una acción de carácter general como la acción de daños por dolo contractual. Examinada la cuestión detenidamente hemos concluido que la acción de saneamiento por vicios ocultos no excluye de por sí otras acciones que puedan ser procedentes bajo las circunstancias especiales del caso, en particular la acción por dolo cuyos propósitos y efectos son distintos de los de la acción de saneamiento. Ha pesado en nuestro ánimo la circunstancia de que la cuarentena era conocida por el vendedor pero no por el comprador. Antes de entrar de lleno en la discusión del problema resumamos los principios básicos relativos a cada figura.

## II

La acción de saneamiento es una acción especial propia de los contratos de compraventa que refleja la obligación del vendedor de garantizar al comprador el uso y

disfrute de la cosa objeto del contrato.(²) Presenta dos modalidades: el saneamiento por evicción(³) y el saneamiento por vicios ocultos en la cosa. Esta última que es la que nos concierne,(⁴) tiene dos vertientes por las que el comprador puede optar: la acción redhibitoria y la estimatoria o *quantiminoris*. Mediante la redhibitoria el comprador elige la rescisión del contrato que consiste en devolver el objeto y recibir el precio pagado, y en adición puede obtener indemnización de daños si el vendedor conocía el vicio.(⁵) Mediante la estimatoria elige recibir una rebaja del precio en atención a la disminución de valor ocasionada por el defecto.

▮ Pero, además de regular la acción de saneamiento por vicios en general, el Código se dirige al caso particular de los vicios ocultos en animales.(⁶) El término para ejercer la acción general es de seis (6) meses; en la de ani-

---

(²) Código Civil, 1930, Art. 1350 (31 L.P.R.A. sec. 3801):

"El vendedor está obligado a la entrega y saneamiento de la cosa objeto de la venta."

Art. 1363 (31 L.P.R.A. sec. 3831):

"En virtud del saneamiento a que se refiere [el Art. 1350], el vendedor responderá al comprador:

"1. De la posesión legal y pacífica de la cosa vendida.

"2. De los vicios o defectos ocultos que tuviere."

(³) El saneamiento por evicción está regulado en los Arts. 1364 a 1372 (31 L.P.R.A. secs. 3832 a 3840).

(⁴) El Art. 1373 (31 L.P.R.A. sec. 3841), califica los defectos que dan lugar al saneamiento. Además de no estar a la vista deben afectar el uso a que se destina la cosa.

(⁵) Art. 1375 (31 L.P.R.A. sec. 3843):

"En los casos de . . . [saneamiento por vicios ocultos], el comprador podrá optar entre desistir del contrato, abonándosele los gastos que pagó, o rebajar una cantidad proporcional del precio, a juicio de peritos.

"Si el vendedor conocía los vicios o defectos ocultos de la cosa vendida y no los manifestó al comprador, tendrá éste la misma opción y además se le indemnizará de los daños y perjuicios, si optare por la rescisión."

(⁶) Arts. 1380, 1382–1388 (31 L.P.R.A. secs. 3848, 3850–3856). Aunque el Código usa el término de "acción redhibitoria" únicamente en estos artículos relativos a los vicios en animales, el término aplica igualmente a la acción de rescisión en los casos generales. Véase Scaevola, *Código Civil*, 2da ed., Madrid, Ed. Reus, 1970, T. 23, pág. 186.

males es de cuarenta (40) días. (⁷) Véanse, *Boyd* v. *Tribunal Superior*, 101 D.P.R. 651 (1973); *Ferrer* v. *General Motors Corp.*, 100 D.P.R. 246 (1971).-

## III

Examinemos ahora la figura de dolo contractual, que rebasa las figuras del saneamiento por evicción y del saneamiento por vicios ocultos, y que es la que estimamos determinante dentro de los hechos de este caso. Tiene dos aplicaciones fundamentales reguladas por nuestro Código Civil. Su primera aplicación causa la anulabilidad del contrato por vicio en el consentimiento, en el origen del contrato, cuando éste se obtiene a través de maquinaciones insidiosas. Código Civil, 1930, Arts. 1217, 1221 y 1222 (31 L.P.R.A. secs. 3404, 3408 y 3409). (⁸) Incluye el engaño, el fraude, la falsa representación, la indebida influencia, etc. *Cruz* v. *Autoridad de Fuentes Fluviales*, 76 D.P.R. 312, 319–320 (1954).

Su otra aplicación consiste en el dolo contractual que ocurre en el curso de la consumación del contrato o sea en el cumplimiento de las obligaciones contractuales, regida por los Arts. 1054 y 1055 (31 L.P.R.A. secs. 3018 y 3019). (⁹) Respecto al primer artículo —el 1054— (Código español, Art. 1.101) dice Manresa: (¹⁰)

---

(⁷) Art. 1379 (31 L.P.R.A. sec. 3847) y Art. 1385 (31 L.P.R.A. sec. 3853).

(⁸) Art. 1217:

"Será nulo el consentimiento prestado por error, violencia, intimidación o dolo."

Art. 1221:

"Hay dolo cuando con palabras o maquinaciones insidiosas de parte de uno de los contratantes, es inducido el otro a celebrar un contrato que, sin ellas, no hubiera hecho."

Art. 1222:

"Para que el dolo produzca la nulidad de los contratos, deberá ser grave y no haber sido empleado por las dos partes contratantes.

"El dolo incidental sólo obliga al que lo empleó, a indemnizar daños y perjuicios."

(⁹) Art. 1054:

"Quedan sujetos a la indemnización de los daños y perjuicios causados, los

Expresión tan amplia comprende como origen de responsabilidad cualquier hecho no lícito que pueda, causando perjuicio, alterar el cumplimiento fiel, estricto y normal de las obligaciones, cualquier medio o forma de incumplimiento de éstas, y en tal sentido es precepto, éste que comentamos, que suple el silencio del Código en otros lugares, y permite invocarle en todos los en que pueda haber ocasión de responsabilidad, . . . siempre que sea posible la necesidad de la indemnización, y su procedencia no tenga, a más de este apoyo general, una declaración general [*sic*] y expresa, como la que consigna el Código en ciertas ocasiones. . . .

■ Al comentar el siguiente Art. 1055, que se refiere específicamente al dolo, señala Manresa que "consiste en el propósito consciente, intencionado, de eludir el cumplimiento normal de las obligaciones",[11] y observa que la definición no se encuentra en esta parte del Código, y que la que se da en el Art. 1221, *supra* (1.269 español) no es enteramente aplicable a esta figura de responsabilidad contractual (al dolo) porque "hecha como está para una hipótesis distinta de ésta, se refiere a un aspecto y especie de dolo, al que concurre en el *origen* de las *obligaciones* y puede ser *causa de nulidad* (aunque también de indemnización), y no puede abarcar el total concepto de aquél, ni esta otra manifestación, con la cual aparece en la *ejecución* de obligaciones *ya existentes* y es *motivo de responsabilidades*".[12] Más adelante añade Manresa que no son sin embargo "entidades completamente independientes", sino que el concepto jurídico es, "en cierto modo, único".[13] En

que en el cumplimiento de sus obligaciones incurrieren en dolo, negligencia o morosidad, y los que de cualquier modo contravinieren al tenor de aquéllas."

Art. 1055:

"La responsabilidad procedente del dolo es exigible en todas las obligaciones. La renuncia de la acción para hacerla efectiva, es nula."

[10] Manresa, *Comentarios al Código Civil Español*, 6ta ed., Madrid, Ed. Reus, 1967, T. 8, Vol. 1, pág. 172.

[11] *Íd.*, pág. 209.

[12] *Íd.*, págs. 209–210 (énfasis en el original).

[13] *Íd.*, pág. 211.

síntesis lo caracteriza como la infracción voluntaria y consciente de un deber jurídico que ocasiona al otro contratante un perjuicio del que debe responder.[14]

El caso bajo nuestra consideración, según adelantáramos antes, está predicado en este segundo aspecto del dolo. Por tratarse la alegada actuación dolosa de la ocultación por el demandado de una circunstancia que pudiese constituir un defecto oculto en el objeto vendido y entregado, se presenta el problema de la concurrencia entre las acciones.

■ Esta cuestión planteada por el recurso es novel en esta jurisdicción. Contrario a lo que sugiere el demandado recurrente, la decisión de este Tribunal en *Alonso Hermanos* v. *Matos*, 46 D.P.R. 470 (1934), no obliga a resolver que pasados los 40 días para entablar la acción de saneamiento por vicios en animales el comprador de éstos no tiene ninguna otra causa de acción. En dicho caso el demandante solicitó que se declarara nulo e inexistente un contrato mediante el cual había adquirido ganado, que al momento de la compraventa estaba contagiado con tuberculosis. Ante una alegación del demandado de que la causa de acción estaba prescrita por haber transcurrido el término de cuarenta (40) días, este Tribunal resolvió que en efecto lo estaba porque el Art. 1397 del Código Civil de 1902 —Art. 1383 del Código Civil de 1930 (31 L.P.R.A. sec. 3851)— que declara nulos los contratos de venta que tengan por objeto animales que padezcan enfermedades contagiosas, no establece una acción de nulidad absoluta ni una de anulabilidad, sino una instancia de acción redhibitoria a la cual aplica el término de cuarenta días a que están sujetas todas las acciones redhibitorias sobre animales. Fue en ese contexto que expresamos la intención legislativa de sujetar estas acciones a un término limitado, lo cual no indica la intención de impedir otras acciones que procedan.

---

[14] *Íd.*, pág. 212.

■ En posteriores ocasiones este Tribunal ha señalado en términos generales que las acciones de saneamiento no son exclusivas. En *González* v. *Centex Const., Co., etc.*, 103 D.P.R. 82, 85–86 (1974), dijimos que las reclamaciones por ventas defectuosas no tienen que enmarcarse necesariamente dentro de la acción redhibitoria o la estimatoria. Así expresamos:

> Los compradores tienen en estos casos una serie de causas a su disposición, cada cual con sus propios preceptos y principios. Dependiendo de las circunstancias, puede acudirse, entre otras, a la acción decenal a que alude al [*sic*] Art. 1483 de nuestro Código Civil, 31 L.P.R.A. sec. 4124; a la que fluye de la culpa aquiliana; a la rescisoria por error, dolo o lesión; y a las que deriven de la violación de obligaciones contractuales. El análisis de cada caso depende naturalmente de las figuras jurídicas en juego.

En consecuencia concluimos allí que la prueba y la demanda no establecían una acción estimatoria sino una contractual bajo la garantía que la compañía demandada dio a los compradores de corregir los defectos, y a base de esta figura analizamos los errores alegados, y modificamos la cuantía de daños concedida por el juzgador.

En *Ferrer* v. *General Motors Corp.*, supra, señalamos que, en casos de vehículos defectuosos, además de las acciones de saneamiento por vicios ocultos contra el vendedor —la redhibitoria y la estimatoria— existe la garantía escrita del fabricante del vehículo, que forma parte del contrato de venta. Aunque el caso se resolvió primordialmente a base de las normas de saneamiento, también se tomó en consideración la existencia de la garantía contractual.

La jurisprudencia del Tribunal Supremo de España también se ha inclinado a aceptar que la acción de saneamiento no excluye otras acciones apropiadas como (1) una acción de daños y perjuicios por incumplimiento de las obligaciones, incuria o negligencia al amparo del Art. 1.101 español (equivalente al 1054 nuestro), sentencia de 6

de mayo de 1911; (2) acción de indemnización por dolo incidental, sentencia de 19 de abril de 1928; (3) acción resolutoria del contrato por no conformarse la cosa entregada a lo pactado, sentencia de 1° de julio de 1947; (4) inexistencia del contrato por error y dolo al no servir la cosa para los fines a que los compradores querían destinarla, sentencia de 6 de junio de 1953; (5) acción para obtener reparaciones derivadas del defectuoso cumplimiento de la obligación contractual, sentencia de 23 de junio de 1965.

En la sentencia de 13 de marzo de 1929 el Tribunal Supremo Español mencionó directrices para diferenciar cuándo la acción ejercitada era propiamente una de saneamiento y no una acción general, al decir que "forzoso se hace distinguir entre aquello que se pide en la demanda que realmente tiene carácter de saneamiento por vicios ocultos de la cosa vendida aun cuando se halle desfigurado para huir de la prescripción especial [de seis meses] y aquello que no lo tiene, toda vez que aun cuando todo proceda de un mismo hecho [,] distintas, aunque compatibles según la sentencia [de 6 de mayo de 1911] antes citada hay que conceptuar las acciones concedidas para su efectividad. . .".

Aunque la doctrina española no es uniforme, prevalece la postura de que la acción de saneamiento no excluye de por sí a otras acciones de carácter general. Véanse, Badenes Gasset, *El Contrato de Compraventa*, Madrid, Ed. Tecnos, 1969, T. 1, págs. 705, 717–718; Castán, *Derecho Civil Español, Común y Foral*, 10ma ed., Madrid, Ed. Reus, 1977, T. 4, pág. 130; Manresa, *op. cit.*, T. 10, Vol. 1, págs. 344–345; Puig Brutau, *Fundamentos de Derecho Civil*, 2da ed., Barcelona, Ed. Bosch, 1978, T. II, Vol. I, pág. 105;[15] J. Santamaría, *Comentarios al Código Civil*,

[15] En la primera edición de esta misma obra, a las págs. 131–132, Puig Brutau concluía su discusión de la cuestión apuntando que no se debía discutir y resolver el problema a base de expresiones legislativas confusas, sino a base de

Madrid, Ed. Revista de Derecho Privado, 1958, T. 2, págs. 523–524; Scaevola, *op. cit.*, págs. 222–224. ([16])

La discusión más completa del problema la hace Diego Espín en *Concurrencia de la acción de saneamiento por vicios ocultos en la compraventa y de las acciones generales de nulidad, resolución o daños contractuales*, 222 Rev. Gen. de Leg. y Jur. 909 (1967). Luego de exponer diversas posiciones doctrinales y señalar que la doctrina española "no ha dedicado demasiada atención al tema . . .", pág. 929, discute jurisprudencia del Tribunal Supremo Español anticipando que "en los no muy numerosos casos en que ha tenido que pronunciarse sobre la concurrencia de acciones de saneamiento por defectos ocultos y otras acciones generales, muestra una orientación favorable a la admisibilidad de las acciones generales, siempre que no exista oposición con preceptos concretos del saneamiento", pág. 931. Luego de resumir las sentencias a que nos hemos referido anteriormente Espín expone que hay tres tipos de concurrencia de acciones:

(a) Entre la acción de saneamiento por vicios ocultos y la de nulidad por error sustancial o engaño doloso que vicien el consentimiento. Respecto a estos casos la jurisprudencia ha resuelto que no hay incompatibilidad.

(b) Entre la acción de saneamiento por vicios y la acción de daños en relación a la cual la jurisprudencia ha declarado que hay incompatibilidad en la medida que sean incompatibles las respectivas disposiciones, pero no la hay si no existe oposición.

(c) Entre la acción de saneamiento y la acción resolutoria a causa de incumplimiento por falta de identidad entre la cosa vendida y la entregada. Entre estas acciones la juris-

---

un balance de conveniencia social respecto a si el perjudicado debe estar sujeto a un período de prescripción de seis meses o el de cuatro años de las acciones de nulidad a las que se refería.

([16]) La principal discrepancia entre los tratadistas y comentaristas no es en torno a la admisibilidad de las acciones generales sino en cuanto a *cuáles de éstas* son excluidas por la acción de saneamiento y cuáles no.

prudencia ha señalado que no hay incompatibilidad. Págs. 938–939.

Concluye el distinguido autor que el Tribunal Supremo ha actuado con prudencia al mostrar flexibilidad decidiendo en cada caso particular si la norma especial debe aplicarse excluyendo a la norma general cuando ésta se le oponga. *Íd.*, pág. 940.

■ Considerando el análisis que hemos expuesto podemos concluir que: (1) de los hechos de un caso en que se ha vendido un objeto con defectos puede surgir la posibilidad de que se ejercite la acción especial de saneamiento por vicios ocultos y/o una o varias acciones de carácter general las cuales no son incompatibles de por sí; (2) el comprador afectado puede optar por ejercer la acción que estime más apropiada para proteger sus derechos siempre y cuando no haga uso de la acción general para soslayar preceptos relativos a la acción especial que sean aplicables y que sean incompatibles con las disposiciones de la acción general; (3) al dilucidarse cuál entre dos disposiciones incompatibles es la aplicable, deben examinarse las circunstancias particulares del caso y los derechos reclamados por el comprador afectado para determinar si la norma especial es la que aplica y excluye a la general.

El análisis correspondiente de las circunstancias del presente caso demuestra que la acción ejercitada por el demandante no fue la de saneamiento sino la de daños por dolo o negligencia contractual, que ésta era la acción apropiada, y que, por tanto, no aplica el término prescriptivo de 40 días que rige las acciones de saneamiento en casos de animales.

## IV

■ Es conveniente reiterar lo expresado anteriormente [17] en el sentido de que el derecho de saneamiento le

---

[17] Véase la nota 5 y el texto a que se refiere.

presenta al comprador dos opciones: la acción redhibitoria para rescisión del contrato y devolución recíproca de las prestaciones objeto del contrato, y en adición, indemnización por daños si el vendedor conocía los defectos; y la acción estimatoria para obtener compensación por la disminución de valor que el defecto ocasiona en la cosa. Ninguna de las dos opciones resultaba razonable ni apropiada en el presente caso. Veamos.

En primer lugar, en el mundo contemporáneo de amplia y exhaustiva reglamentación gubernamental que vivimos, el tráfico de ganado enfermo se ha salido del ámbito del Derecho privado regulado por el Código para convertirse en materia de innegable interés público detalladamente reglamentado por los Departamentos de Agricultura federal y local. En vista de ello, actuó correctamente el demandante Márquez cuando al enterarse de que el ganado comprado al demandado Torres Campos provenía de una finca que había sido puesta en cuarentena por las mencionadas agencias, procedió a comunicarse con una de éstas y a someterse al procedimiento indicado por las referidas agencias gubernamentales en estos casos. Estimamos que actuó responsablemente al procurar la intervención de las agencias mencionadas antes de dirigirse al vendedor demandado. Asimismo actuó razonablemente cuando al percatarse de que por la vía del Derecho público no habría de obtener una reparación adecuada de los daños que estaba encarando, decidió entablar la reclamación privada contra el responsable de los daños.

Tales daños se iniciaron en el momento en que el demandante Márquez llevó a su finca las reses contagiadas con el germen de la tuberculosis, cuya circunstancia ignoraba por habérselo ocultado el demandado. La causa de acción del demandante, por tanto, surge no del hecho objetivo del defecto en el objeto del contrato que es lo que da vida a una acción de saneamiento, sino de una circunstancia subjetiva provocada por la actuación dolosa del

demandado que redundó en unos daños que van más allá del defecto en el objeto del contrato y por tanto están fuera del marco de la figura del saneamiento. Como cuestión de hecho el problema no surgió propiamente del defecto de que adolecían las reses vendidas, que presumiblemente no estaban todas enfermas al momento de la venta, sino que se originó como consecuencia de la presencia del germen contagioso en el hato del cual provenían.

 La demanda revela adecuadamente que la causa de acción ejercitada por el demandante no fue la de saneamiento sino la de indemnización por dolo contractual. La prueba sostiene la conclusión del Tribunal inferior sobre su procedencia. Debido a que el perfeccionamiento y la consumación del contrato ocurrieron virtualmente a la vez, la actuación dolosa del demandado, consistente en callar voluntaria y conscientemente respecto a la condición de contagio del ganado [18] afectó ambos momentos del contrato. En otras palabras, el dolo surgió tanto al procurar el consentimiento del comprador como al cumplir con la obligación contractual de entregar el objeto de la compraventa al demandante. [19] El comprador, pues, tiene derecho a recobrar del vendedor los daños que su conducta antijurídica le ocasionó.

## V

La conclusión a que hemos llegado nos obliga a examinar el planteamiento del demandado recurrente en

[18] La doctrina acepta que el callar sobre una circunstancia tan importante como la aquí presente, constituye dolo. Manresa por ejemplo, al discutir la posible concurrencia de la acción de saneamiento con la de dolo dice que "si el vendedor conocía los defectos y no los manifestó al comprador, se puede decir que procedió con verdadero dolo . . .", *op. cit.*, T. 10, Vol. 1, pág. 344. Véase también, Puig Brutau, *op. cit.*, págs. 97–98.

[19] Aunque el dolo no se presume, no tiene que probarse directamente y puede inferirse de evidencia circunstancial como cualquier otro hecho. Véase *García López* v. *Méndez García*, 102 D.P.R. 383 (1974). Hay suficiente evidencia para inferir que el demandado ocultó todo el asunto de la cuarentena intencional y no accidentalmente.

torno a la mitigación de daños y examinar si las partidas de daños concedidas son recobrables bajo la causa de acción ejercitada.

El tribunal a quo rechazó la alegación de mitigación de daños al sostener que el demandante hizo todo lo que razonablemente podía hacer para enfrentar la situación dañosa provocada por la entrega de ganado proveniente de una finca contagiada. No incurrió en error el tribunal sentenciador. Ya hemos dicho que el demandante actuó correctamente al acudir a las autoridades gubernamentales y seguir al pie de la letra los procedimientos establecidos por éstas. Aun cuando hubiera podido separar las reses enfermas de los demás animales, actuación que el tribunal inferior determinó no hubiera variado el efecto de la cuarentena, sería especulativo señalar que hubiera minimizado significativamente los daños pues como ya subrayamos éstos empezaron a surgir desde que el comprador Márquez llevó las reses contagiadas a su finca con la consiguiente introducción del germen. Para el momento en que se enteró de la existencia del germen de tuberculosis, ya poco, si algo, podía hacer para evitar las consecuencias: la cuarentena de su finca, el sacrificio de los animales contagiados y la despoblación.

El tribunal sentenciador concedió las siguientes partidas de daños:

1. gastos en que incurrió el demandante por motivo de las inspecciones: $1,160;

2. pérdida de $3,690 en la venta de los cabros;

3. pérdida de $220 en el sacrificio de las gallinas;

4. ganancia dejada de percibir en el negocio de los cabros: $4,000;

5. ingresos dejados de devengar en el negocio de carne: $22,955; [20]

---

[20] El tribunal hizo el siguiente cálculo: Las 105 cabezas de ganado que tenía el demandante en su finca costaron $26,034. Al sacrificar unas y vender otras recibió $29,254 para una ganancia de $3,220. Según lo estipulado por las

6. $2,500 por las angustias mentales ocasionadas al demandante al imponerle la cuarentena a la finca, cuyos daños eran previsibles por el demandado.

Todos los daños enumerados están claramente comprendidos dentro de la responsabilidad por dolo contractual y no se nos ha persuadido de que debamos modificarlos. ([21])

*La sentencia debe ser confirmada.*

El Juez Presidente Señor Trías Monge, y el Juez Asociado Señor Dávila no intervinieron.

---

partes, de haber podido criar el ganado y venderlo posteriormente como era el propósito del Sr. Márquez, hubiese tenido un ingreso de $26,175 por lo que habiendo obtenido sólo $3,220, dejó de devengar $22,995.

([21]) Véase: Art. 1059 (31 L.P.R.A. sec. 3023):

"La indemnización de daños y perjuicios comprende, no sólo el valor de la pérdida que haya sufrido, sino también el de la ganancia que haya dejado de obtener el acreedor, salvas las disposiciones contenidas en las secciones siguientes."

Art. 1060 (31 L.P.R.A. sec. 3024), segundo párrafo:

"En caso de dolo responderá el deudor de todos los [daños y perjuicios] que conocidamente se deriven de la falta de cumplimiento de la obligación."

Sobre la procedencia de daños morales en reclamaciones de carácter contractual, véase *Pereira* v. *I.B.E.C.*, 95 D.P.R. 28 (1967).