**Jose R. TORRES MAS, Plaintiff,**

v.

**CARVER BOAT CORPORATION, Defendant.**

**No. CIV. 00–1652(RLA).**

United States District Court, D. Puerto Rico.

April 8, 2003.

José V. Díaz Tejera, Trujillo Alto, Julio Pijem–Berrios, Guaynabo, PR, for Plaintiff or Petitioner.

Angel Rotger Sabat, Maymi & Rivera–Fourquet, PSC, Hato Rey, PR, for Defendant or Respondent.

### OPINION AND ORDER

ACOSTA, District Judge.

Plaintiff José R. Torres–Mas ("Torres–Mas"), a citizen of Puerto Rico, brought this suit against defendant Carver Boat Corporation ("Carver Boat"), a Delaware corporation that manufactures vessels in Wisconsin, invoking this Court's jurisdiction under diversity of citizenship, 28 U.S.C. § 1332. Torres–Mas prays for rescission of the contract whereby he purchased a vessel manufactured by Carver

Boat in accordance with the provisions of the Puerto Rico Civil Code.

A non-jury trial was held on March 18 and 19, 2003.

### I. PROCEDURAL BACKGROUND

Torres–Mas filed his original complaint against Carver Yachts on May 25, 2000 requesting the rescission of the sale of a 35–ft. vessel manufactured by Carver Boat, with engines manufactured by Crusader Engines, predecessor of Thermo Power and Pleasurecraft.[1] In essence, plaintiff alleged that the boat suffered from several malfunctions which were never repaired by defendant and rendered it unseaworthy. Specifically, plaintiff claimed that ever since he purchased the vessel there was constant salt water intake and problems with its performance which made the vessel unfit for its intended use. On August 15, 2000, Torres–Mas amended the complaint solely to correct the name of defendant Carver Boat. No modifications were made at that time either to the facts alleged or the legal theory advanced in the complaint. Plaintiff filed a Second Amended Complaint on February 19, 2002 referring to the vessel's sinking on August 29, 2000. This pleading was stricken by the court.[2]

Prior to commencement of trial the Court dismissed plaintiff's request for mental anguish, pain, suffering and moral

---

1. Based on plaintiff's allegations regarding the vessel's engines Carver Boat impleaded Crusader Engines, the engine's manufacturer and predecessor of third party defendants Thermo Power Corporation and Pleasurecraft Marine Engine Company as well as Luis Pacheco d/b/a Lumar Marine Parts and Services, Inc. a Puerto Rico citizen who had worked on the engines.

All issues regarding malfunction and/or performance of the engines as well as the third party complaint were settled on the eve of

trial. See Minutes of Telephone Conference Held on March 17, 2003 (docket No. 94) and Partial Judgment issued on April 3, 2003 (docket No. 102). Accordingly, evidence regarding engine trouble as alluded to in the Amended Complaint ¶¶ 10, 11, 14 and 16 was not admissible at trial.

2. See Order Striking Second Amended Complaint, filed on September 27, 2002 (docket No. 72) and Minutes of Telephone Conference Held on March 17, 2003 (docket No. 94).

damages[3] as improper under applicable rescission principles. Additionally, plaintiff's Motion in Limine regarding the testimony of Mr. Michael Osmanski as a fact witness for Carver Boat (docket No. 93) was denied.

## II. FINDINGS OF FACT

The court having carefully considered the testimony presented at trial together with the pleadings and documents admitted into evidence hereby makes the following findings of facts in this case:

Plaintiff, a resident and citizen of Puerto Rico, has had more than fifteen (15) years of experience with vessels, owned and used. Sea vessels and helicopter flying are his hobbies.

Defendant is a Delaware corporation with operations in Wisconsin. Mr. Michael Osmanski is currently a technical service manager at Carver Boat and an employee of the company for eighteen (18) years. As part of his duties, Mr. Osmanski deals with service related questions from dealers and customers. Further, Mr. Osmanski has experience in the manufacturing process of vessels at Carver Boat's facilities. This process includes quality testing and inspection procedures regularly carried out by Carver Boat personnel prior to shipping a newly-manufactured vessel. Mr. Osmanski personally inspected plaintiff's vessel on January 22 and 23, 2003 at its home port dry storage area.

In May 1998 Plaintiff purchased a Carver Boat model 350 Mariner, year 1999, hull # CDRR8006F899, with twin 7.4 LMPI Mercury Inboard engines through Sun & Sea Marine, Inc., its exclusive dealer in Puerto Rico, which he named "Crystal Waves".

Before he purchased the Crystal Waves plaintiff had met Mr. Juan Lorenzo Martínez Colón, general manager of Sun & Sea Marine and had been on board of Mr. Martínez Colón's Carver vessel. Mr. Lorenzo personally handled the negotiations with plaintiff regarding the purchase of the vessel. Mr. Martínez Colón testified that plaintiff had always shown an interest in the Carver 350 Mariner model and that he did not have any influence in plaintiff's decision to purchase that particular model. This statement was confirmed by the fact that prior to his contact with Sun & Sea Marine Torres–Mas had procured a price quotation for a 1998 350 Mariner from a Carver Boat dealer in Florida.

The purchase price of the Crystal Waves was $186,000. Plaintiff paid a downpayment and financed the balance of $156,100 with Bank & Trust of Puerto Rico.

The Crystal Waves was manufactured, inspected and tested by Carver Boat at its facilities at Pulaski, Wisconsin, during June, 1998. Quality assurance was given by Carver Boat personnel as evidenced in the vessel's Quality Assurance Packet. Further, no major problems were reflected in the vessel's Inspection Data Analysis and Test Facility Inspection reports, especially related to the vessel's bilge pumps. Mr. Osmanski testified that each new vessel is checked with a 300–item checklist and it is placed in a test facility pool in the factory for four (4) hours, where four (4) Carver Boat inspectors record the results of all the testing. Mr. Osmanski also explained that the results of all the aforementioned reports confirm that plaintiff's vessel was in condition and seaworthy when it left the factory and before being shipped to Puerto Rico.

The Crystal Waves was released for shipment by the manufacturer on July 1, 1998 and delivered to plaintiff at San Juan

---

3. Amended Complaint ¶ 19.

Bay Marine, San Juan, Puerto Rico, on November 8, 1998. At that time Torres–Mas signed the Pre–Delivery Service Record for the vessel required by Carver Boat for its warranty and received the vessel's manual (Owner's Guide) which he admitted having read.

Plaintiff then transported the Crystal Waves by sea to its home port in Marina del Puerto del Rey, Fajardo, Puerto Rico. According to plaintiff, during the initial trip to Fajardo saltwater was entering the vessel's cabin and its speed was not what he had expected. However, Torres–Mas was able to reach the home port and admitted that even though his main concern was the water intake he continued to utilize the vessel.

Plaintiff consented to the use of the Crystal Waves as the Carver Boat exhibition vessel in the Puerto del Rey Boat Show, held on Martin Luther King's Jr. Holiday Weekend in January of 1999. Mr. Gustavo Léctora, an employee of Sun & Sea Marine,[4] stayed two (2) nights on board the vessel while on exhibition at the boat show.

On April 27, 1999, Mr. Rich Brown, International Sales and Service Director at Carver Boat, received a telephone call from plaintiff voicing various complaints regarding the vessel's operation, particularly the engines and replacement of several parts inside the cabin. As explained by Mr. Osmanski, Carver Boat's normal procedure for handling customer claims requires that the same be brought to Carver Boat's attention via its dealers. Should a customer contact Carver Boat directly, the company requests that the concerns be put in writing so that they can be forwarded to the local dealer for immediate attention. Thus, Mr. Brown asked plaintiff to forward his claims in writing, which he did by way of a letter addressed to Mr. Brown on April 28, 1999.[5] This was the first letter sent to Carver Boat by plaintiff regarding his vessel.

Mr. Léctora was certified by Carver Boat at its facilities in Wisconsin to work as a Carver technician. He personally provided services to plaintiff's vessel from March 1999 until December 1999. His work included the inspection of all four (4) bilge pumps; replacing the forward bilge pump under the vessel's kitchen and bathroom area as well as repairing the connection of the bilge pump wiring which had been tampered and was not in the same condition as when it left the manufacturer's facilities. Mr. Léctora testified that he saw some water in this area, that he did not test to see if it was salt or freshwater, but that its level was approximately 1/4 inch and not high enough to activate the bilge pump system nor could it be considered as an abnormal intrusion of water in the vessel, which under normal circumstances will always take in some water while navigating at sea. Both Mr. Léctora and Mr. Osmanski stated that any modifications or alterations to the bilge pump wiring could affect its operation and hence the bilge pump would not be able to extract water from the area in the vessel where it is located.

When confronted with each of the items of the list attached to his April 28th letter to Carver Boat, Torres–Mas acknowledged that he had installed the bilge pumps in the vessel and not Sun & Sea Marine.

---

4. Mr. Léctora has a bachelor's degree in engineering and was a Sun & Sea Marine sales and service representative from February 1999 until March 2000. He later became Marina Puerto del Rey's manager.

5. The letter was admitted as a Joint Exhibit I.

Mr. Léctora submitted warranty claims No. W84236 and W84238 to Carver Boat where he itemized all repairs done on plaintiff's vessel. These included, among others, replacement of doors and locks, installment of a cabin window, and repairing bridge switch lights and bathroom faucet connection. In short, Carver Boat honored and paid all warranty claims to Sun & Sea Marine.

Mr. Léctora informed both Mr. Juan Lorenzo Martinez and plaintiff of the repairs done by him.

On July 2, 1999, Mr. Rich Brown sent a letter to plaintiff[6] in response to his April 28th letter and informed him that substantial progress had been achieved by Sun & Sea Marine in repairing the vessel and that Carver Boat was extending its warranty for any items addressed in plaintiff's letter still not resolved by the warranty's expiration date. Mr. Torres–Mas testified that he was not in agreement with this letter, but admitted that he did not object to it in writing nor responded to it.

Torres–Mas used the vessel after Rich Brown's July 2, 1999 letter and continued to use it until June, 2000 even with the alleged problems.

Plaintiff admitted that the vessel has been out of the water, in dry storage for over a year. Carver Boat's warranty applicable for its 1999 vessels requires that the owner follow the Owner's Guide specifications for its use, maintenance and storage, and that the vessel's parts not be modified or altered from factory specifications.

Torres–Mas denied that he had filed a claim against the insurance policy of the vessel, even though he conceded having received several letters from the policy's adjusters. Plaintiff received a letter dated October 2, 2000 from Wager & Associates,

Inc., yacht surveyors and adjusters, advising him that his claim for recent damage to the vessel was denied because no prompt remedial action was taken that would have kept the repair costs well below the policy deductible of $3,940.00. These were described as follows: (1) no action was taken to clean up the freshwater intrusion hence allowing damage to become more severe; (2) he had failed to exercise due diligence in minimizing the loss and protecting the vessel from further loss, and to maintain the vessel in a seaworthy condition, and (3) the increased repair costs of the vessel were a direct result of plaintiff's failure to comply with his duties to minimize the loss and his failure to take steps to have the water intrusion dealt with upon discovery of the same.

Torres–Mas testified that he was not in agreement with the contents of the adjusters' letter, but admitted that he did not object to it in writing nor request reconsideration of the insurer's decision. He simply handed the document over to his counsel, who by then had already filed the complaint in this case.

Mr. Léctora testified that the work he performed on plaintiff's vessel were minor repairs, which did not prevent plaintiff from using the vessel. Mr. Osmanski confirmed that the work done by Sun & Sea Marine as itemized in the warranty claims submitted for the Crystal Waves pursuant to plaintiff's April 28, 1999 letter, were minor, cosmetic repairs which in no way affected its seaworthiness.

Mr. Léctora and Mr. Martínez Colón testified that plaintiff had never brought to their attention a problem of leakage of saltwater in the vessel. Mr. Osmanski testified that according to Carver Boat records, the first time the company

6. This document was admitted as Joint Exhib-      it II.

learned of saltwater leakage was through the report of its expert witness, Mr. Carlos E. Suárez, dated December 5, 2001.

The parties stipulated Mr. Suárez's December 5, 2001 damage survey report and his curriculum vitae in lieu of his testimony at trial. The report, together with the photographs taken by the expert cover the inspection and tests done on the vessel on October 24, 31, and November 23, 2001. According to the report plaintiff, counsel for all parties and the expert witnesses of the third party defendants were present at the October 24, 2001 inspection. Mr. Suarez and the expert witnesses for the third party defendants were present in the latter inspections. No expert witness for plaintiff was present at the time.

In his report Mr. Suárez described the conditions of the vessel as follows: (1) aft, mid and forward bilges were with several inches of what appeared to be freshwater; (2) forward bilge had approximately 10 inches of water from the keel up; (3) interior and upholstery were stuffy, moisture stains in the materials; (4) the refrigerator had perishable groceries in the interior, the oozing of the decomposed groceries corroded the door and frame of the refrigerator; and (5) no leaks or traces of moisture observed on the hull bottom.

Plaintiff's expert witness, Julian A. Ducat, submitted a hull damage survey report dated March 26, 2002 which covered his inspection of the vessel on March 14, 2002 at which time he was accompanied solely by plaintiff. Mr. Ducat testified that he was informed by the owner that the vessel took in water and that the location of the leak was unknown. Mr. Ducat admitted that in his inspection he did not verify the location of the alleged leak; he did not carry out any tests to find out the source of the leak, and could not ascertain why there was water intake in the vessel. Mr.

Ducat confirmed that the vessel was out of the water, in dry storage when he inspected it, but he could not indicate if the vessel's drain plug was still connected, even though there was water inside the vessel. Mr. Ducat did see mold evidence in the carpet and fabrics, but did not check if the battery was still connected to the engines and did not notice if there was food in the refrigerator. Mr. Ducat admitted that he did not check whether the bilge pumps and its wiring were working properly, even though it was pointed out that it was a major concern in plaintiff's list of claims in his April 28th letter. Mr. Ducat testified that he attached the report prepared by Thermo Power's expert witness, Mr. Edgardo J. Jiménez to his own report. When asked whether he concurred with all of Mr. Jiménez's findings, Mr. Ducat answered that he did not concur with all of Mr. Jiménez's findings but was unable to explain why no discrepancies with Mr. Jiménez's report were pointed out in his own report. Mr. Ducat was unaware that at the time of his inspection and the preparation of his report, in March 2002, plaintiff had already filed a complaint against Carver Boat.

Mr. Osmanski testified regarding the vessel's condition on January 22 and 23, 2003. He indicated that at that time he saw: (1) the engine meter reflected 225 hours of use; (2) the drain plug was still connected and the vessel had water inside, even covering the engine hatch; (3) the battery was still connected and was underwater along with the generator; (4) there was evidence of decomposed food inside the refrigerator, the freezer and kitchen compartments, and (5) there was evidence of mold and moisture stains inside the cabin of the vessel, carpets and even in the flying bridge. He further testified that the bilge pump wiring under the kitchen area was not properly wired and was not

in the same manner as when these vessels leave the Carver Boat facilities.

Mr. Osmanski testified that based on his own experience with vessels, not only as an owner who has purchased used vessels but also as a technical service employee at Carver Boat, the current condition of the Crystal Waves had severely depreciated its value, rendering it worthless. Thus, he could not recommend to a friend or family member the purchase of the vessel.

### III. THE LAW

Plaintiff instituted this action for the rescission of a sales contract based on alleged hidden defects unknown to him at the time of purchase of the vessel manufactured by defendant Carver Boat and sold by its local dealer in Puerto Rico.

Inasmuch as this is an action based on diversity of citizenship Puerto Rico substantive law is used to determine liability. *Correa v. Cruisers*, 298 F.3d 13, 22 (1st Cir.2002).

The Puerto Rico Civil Code provides that a seller is bound to deliver and warrant the object sold. 31 P.R. Laws Ann. § 3801 (1990). It obligates a vender to provide a vendee with a warranty against hidden defects that render a product sold "unfit for the use to which it was destined, or if they should diminish said use in such manner that had the vendee had knowledge thereof he would not have acquired it or would have given a lower price for it". 31 P.R. Laws Ann. § 3841. It is not sufficient for the seller to deliver the object; it must provide a warranty against hidden faults and defects. *Ferrer v. Gen. Motors Corp.*, 100 P.R.R. 244, 253, 1971 WL 30376 (1971).

■ Under Puerto Rico law in order for plaintiff, as the vendee, to prevail in a rescission action based on hidden defects he must prove that: (1) the defects were unknown to him at the time of the purchase; (2) the defects are serious or important enough to render the object unfit for its intended use or diminish its use in such a manner that had the vendee known about the defects he would not have purchased it or would have paid a lower price; (3) the defects existed prior to the sale, and (4) the complaint is filed within 6 months from delivery of the product. 31 P.R. Laws Ann. § 3847. *Correa v. Cruisers; Perez Velez v. VPH Motors Corp.*, —— D.P.R. ——, 2000 TSPR 165, 2000 WL 1724925 (2000); *Ferrer*, 100 P.R.R. at 254.

[2] The defects must be more than minor imperfections to warrant rescission and determination of the seriousness and importance of the alleged defects is essentially a factual matter solely to be determined by the trial court. *Dominguez Talavera v. Caguas Expressway Motors, Inc.*, 99 JTS 85, 1999 WL 727462 (1999); *Garcia Viera v. Ciudad Chevrolet, Inc.*, 110 D.P.R. 158, 1980 WL 138516 (1980). However, it is not essential that the defect makes the object useless provided that it significantly reduces its value. *Perez Velez; Dominguez Talavera*.

■ In actions involving the rescission of motor vehicles the Puerto Rico Supreme Court has ruled that "the purchaser is only bound to establish... that the [object] which he bought does not work properly and that the defendant had the opportunity of correcting the defect but it did not correct or could not correct it." *Ferrer*, 100 P.R.R. at 252; *Perez Velez*.

■ However, a "[d]efendant is exempt from liability; if as an affirmative defense ii shows... that the abnormal performance is caused by plaintiff's acts." *Ferrer*, 100 P.R.R. at 252.

Once the purchaser has met his burden in a claim for rescission he may choose between: (1) withdrawing from the con-

tract with reimbursement of the price paid and expenses incurred; or (2) demanding a proportional reduction of the price, according to the opinion of experts. 31 P.R. Laws Ann. § 3843; *Ferrer*, 100 P.R.R. at 254. In the event that the seller knew of the hidden defects at the time of the sale but failed to notify the purchaser, the purchaser may also request damages in the event rescission is granted. § 3843.

Recoverable "expenses" as opposed to "losses and damages" as per § 3843 are to be interpreted narrowly and are limited to those costs which are directly related to the defect. These are: the price paid and expenses necessarily incurred as a result of the defect. In other words, those directly related to the alleged hidden defects as opposed to ordinary expenses associated with owning a boat that would have been incurred whether or not the boat was defective. Expenses such as dockage, insurance and licensing not related to a defect but rather expenses that plaintiff would have incurred regardless of whether or not the boat suffered problems are not allowed under 31 P.R. Laws Ann. § 3843. *Correa v. Cruisers*, 298 F.3d at 28–9.

■ Even if plaintiff succeeds in proving the necessary elements for rescission, the purchaser has the duty to mitigate damages. Therefore, the purchaser must adopt reasonable and pertinent measures within his capability which tend to reduce the damages to the product sold. In other words, he is required to do everything he reasonably can to deal with the situation. *Marquez v. Torres Campos*, 111 D.P.R. 854, 872, 1982 WL 210682 (1982).

Based on the extensive review of the facts of this case, the evidence presented and the testimony given, this Court finds that plaintiff failed to prove the requisite circumstances the law provides for a rescission action to proceed.

### (1) Notice

■ Plaintiff failed to notify defendant or its local dealer of a serious defect in the vessel regarding the intrusion of saltwater for the period alleged in the Amended Complaint. Even though they testified regarding a concern about the intrusion or intake of saltwater the testimony of defendant's witnesses, including Mr. Léctora— who repaired and replaced several parts of the vessel—clearly established that this concern was never brought to the attention of either the local dealer or Carver Boat until after the filing of the complaint. Contrary to plaintiff's version, neither Carver Boat nor its dealer were notified about a problem with saltwater intake shortly after the vessel was delivered to plaintiff and navigated from San Juan to its home port at Fajardo in November of 1998. Neither were they aware of plaintiff's alleged claim regarding saltwater intrusion during the period of time when service was being provided to the vessel from March to December 1999.

### (2) Hidden Defect

Neither plaintiff nor his expert witness established a hidden defect. Plaintiff, with fifteen (15) years of experience with sea vessels, contends that there was a hidden defect allowing the intake of saltwater inside the vessel, yet he consented to its use during a boat show in January of 1999 in effect vouching for defendant Carver Boat's brand to potential purchasers of vessels.

The only problems brought to the attention of either Carver Boat or its dealer were listed in plaintiff's letter dated April 28, 1999, which was written upon defendant's request. Carver Boat forwarded this letter to its local dealer, Sun & Sea Marine, for immediate attention, which according to Mr. Léctora's testimony was used as his checklist for the repairs he

carried out in the vessel. These repairs were described by defendant's witnesses as minor and cosmetic, not affecting the seaworthiness of the vessel.

Plaintiff's expert witness, Mr. Ducat, testified that of all the items listed in plaintiff's April 28, 1999 letter, the main one was plaintiff's concern regarding the bilge pumps. However, in his March 2002 inspection, Mr. Ducat did not verify if the vessel's bilge pump system was operable, even though he admitted finding water inside the vessel which was not draining out while in dry storage. During cross-examination plaintiff admitted that he had installed a new bilge pump system.

Mr. Léctora testified that in July 1999 he checked all the bilge pumps. Although he found some water in the forward bilge pump area its level was not high enough to activate the automatic system. He did, however, find that the bilge pump wiring had been tampered with upon noticing that black tape had been wrapped around the connections. Mr. Léctora explained that this was not how Carver Boat bilge pump systems are wired. He removed the existing bilge pump and replaced it with a new one. He wired the new bilge pump correctly and tested the system to verify that it was operable electrically.

It is undisputed that the local dealer addressed plaintiff's concerns as per his April 28th letter. Further, the expenses related to these repairs were submitted as warranty claims to the defendant who honored the warranty and paid for them.

The uncontroverted evidence shows that the conditions pointed out to Carver Boat and its local dealer cannot be considered serious or important ones, that is, of such grave magnitude that they rendered the vessel unfit for it intended use or significantly diminished its use or value. This is further evinced by the fact that plaintiff continued to use the vessel notwithstanding his alleged concerns.

Plaintiff's testified that from the first day he navigated the vessel he encountered problems with the intake of saltwater which rendered the vessel unfit or even unsafe for his use merits no credence. He continued to navigate the Crystal Waves since its delivery in November 1998 and even during the period when Mr. Léctora from Sun & Sea Marine was repairing it. The amount of hours in the engines' meter, as seen by Mr. Osmanski in January of 2003, reflect that the vessel had been under considerable use.

Based on the foregoing, the condition of the vessel, particularly after the filing of the original as well as the amended complaint in this case, cannot be adjudicated as a hidden manufacturing defect.

### (3) Defect Prior to Sale

Further, even assuming there was a hidden defect within the meaning of the Puerto Rico Civil Code provisions, there is absolutely no evidence in the record that it pre-existed the sale, or more appropriately in this case, the delivery of the vessel, since it was manufactured after the purchase order was submitted by plaintiff and the local dealer in Puerto Rico. Mr. Osmanski testified at length concerning the numerous checks and tests that were done on this vessel after it was manufactured during June of 1998 and before it was released to be shipped to Puerto Rico. The vessel's Quality Assurance Packet, Inspection Data Analysis, Test Facility Inspection, and Packing List showed that the vessel was in good condition when it left Wisconsin. No problems were detected after having checked all vessel parts including the bilge pump system as well as the hull and water drainage systems. No problems were detected when it was delivered to the plaintiff, particularly regarding leaks or the bilge pumps, as evidenced by

his signature on the Pre–Delivery Service Record. Thus, we can only conclude that no hidden defects were present prior to the delivery date at which time plaintiff acquired exclusive control and maintenance of the Crystal Waves.

### (4) Duty to Mitigate

Lastly, even though we hold that the evidence and testimony presented in this case do not warrant rescission of the contract as prayed for in the complaint, we are compelled to conclude that based on the uncontroverted evidence plaintiff's own acts and omissions regarding the care of the Crystal Waves are the substantial cause for its poor condition and diminished current value. Plaintiff's blatant disregard of his duty to maintain the vessel in seaworthy condition and promptly protect the same while in dry storage seriously impaired any possible remedy that could have been granted in these proceedings.

It is a fact that at the time of trial the vessel had been out of the water for over a year. Plaintiff testified that he only considered two alternatives when dealing with the alleged defects of the vessel: to use it cautiously or to leave it as it was. He never contemplated repairing his vessel. It is clear from plaintiff's own admissions, the testimony of Mr. Ducat and Mr. Osmanski regarding their inspection as well as the damage survey report with photographs prepared by Mr. Suárez, defendant's expert, that the vessel had a considerable level of water inside while on dry storage, with no visible drainage.

Plaintiff testified that he stopped using the vessel in June 2000, after he had already filed the complaint in this case. Even though he alleged to have continued providing maintenance to the vessel the overwhelming evidence at trial established otherwise. It is uncontested that while in dry storage the vessel's main drain plug was still plugged; decomposed groceries remained inside the vessel's refrigerator and kitchen area; the battery was still connected to the engines even when they were covered by water, and there was considerable mold and moisture stains in the interior of the vessel's cabin.

Based on the foregoing, it is evident that plaintiff utterly disregarded the guidelines for proper care, maintenance and storage of the vessel as established in the vessel's Owner's Guide, which he admitted having received and read.

Plaintiff's failure to mitigate damages was also the cause cited by his insurance policy for denying his claim. The insurance company's adjusters notified plaintiff in writing that his absolute failure to promptly minimize the damages to his vessel were the cause of not keeping the repair costs well below the policy deductible and that no action was taken to clean up the water intrusion hence allowing the damage to be more severe.

Plaintiff's failure to exercise due diligence in minimizing and protecting the vessel from further loss had also consequences in his rescission action. This Court cannot condone his blatant disregard to properly protect the product under his care and exclusive control which he intends to return in a rescission action. Plaintiff's continuing duty in equity to properly protect his vessel cannot be abandoned merely because of the filing of the complaint.

In the case at hand even if plaintiff had met his burden to establish a rescission claim for hidden defects he would not be entitled to relief. The remedy allowed by the Civil Code provides for each party to return what was given as part of the sales contract. The vendee must return the merchandise received and the vendor the price paid. Given the current deplorable condition of the vessel—attributable exclu-

sively to plaintiff's neglect—its current value is estimated as worthless. Thus, equity would prevent plaintiff from recovering the disbursed monies since defendant would not receive in return anything remotely close to the product sold.

## CONCLUSION

Based on the foregoing, the claims asserted in the Amended Complaint against Carver Boat are hereby **DISMISSED.**[7]

Judgment shall be entered accordingly.

IT IS SO ORDERED.

---

**7.** Given our ruling, there is no need for the court to further analyze the evidence to determine whether the complaint was filed within the statute of limitations period.