# 2002 DTA 87

### TRIBUNAL DE CIRCUITO DE APELACIONES
### CIRCUITO REGIONAL VII DE CAROLINA Y FAJARDO

ANGEL RIVERA RIVERA
Demandante-Apelado

v.

MANUEL DURAN CRUZ
Demandado-Apelante

Núm. KLAN-01-00774

San Juan, Puerto Rico, a 11 de abril de 2002

Panel integrado por su Presidente, el Juez Miranda de Hostos,
la Juez Hernández Torres y el Juez Martínez Torres

Martínez Torres, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA

Mediante recurso de apelación comparece ante nos Manuel Durán Cruz (el demandado-apelante). Solicita que revoquemos una sentencia dictada el 27 de junio de 2001 por el Tribunal de Primera Instancia, Sala Superior de Carolina (Hon. Gloria I. Pérez Maury, Juez). En la referida sentencia se resolvió que Angel Rivera Rivera (el demandante-apelado) interpuso una acción por cargas o servidumbres no aparentes dentro del término legal establecido, por lo que procede que el demandado-apelante, Durán Cruz, pague una indemnización de $13,851.00, además del pago de las costas del litigio y $500.00 por concepto de honorarios de abogado. Resolvió, además, el tribunal que no procede la reclamación de daños y angustias mentales presentada por el demandante-apelado, Rivera Rivera. Por los fundamentos que expondremos a continuación, se confirma la sentencia apelada.

### I

En el mes de mayo de 1995, el señor Angel Rivera Rivera radicó ante el Tribunal de Primera Instancia una demanda sobre incumplimiento de contrato y daños y perjuicios contra el aquí demandado-apelante, señor Manuel Durán Cruz. Alegó Rivera Rivera que entre él y Durán Cruz se formalizó un contrato de compraventa en el que Durán Cruz le vendió un solar de 1,202.5468 metros, localizado en el Barrio Las Cuevas de Trujillo Alto. Se alegó además que el precio de venta del referido solar fue de $41,554.00, de los cuales el demandado-apelante, Durán Cruz, recibió del demandante-apelado Rivera Rivera la cantidad de $8,500.00. Para el pago de los restantes $33,034.00, Rivera Rivera alegó que suscribió un pagaré al portador con intereses al 11% anual, a vencerse en 10 años. El pago mensual del principal e intereses alegadamente ascendía a $455.48.

También alegó Rivera Rivera que adquirió el solar en cuestión con la intención de construir una residencia permanente; sin embargo, dicho solar tiene defectos ocultos de tal naturaleza que lo hacen impropio para el uso adecuado a su destino. Se alegó que entre los defectos ocultos se encuentra un tubo pluvial distinto al descrito en la escritura de compraventa, dado que es de mucho más espesor y atraviesa la propiedad por el medio.

En cuanto al tubo pluvial, Rivera Rivera alegó que éste impide la construcción de una casa como lo exige la escritura de compraventa. Por otro lado, Rivera Rivera alegó que dentro del solar existe un desagüe del cual emana agua de forma continua. Rivera Rivera expuso, además, que de haber conocido esos defectos no hubiese comprado el referido solar.

Rivera Rivera solicitó en la demanda que se le ordenara al demandado-apelante, Durán Cruz, realizar las obras necesarias en el terreno para que se pueda construir una estructura sólida y permanente sin que las aguas la afecten o impidan su uso. Solicitó también la suma de $45,000.00 por los alegados daños y perjuicios ocasionados, además del pago de las costas y honorarios de abogado.

Al contestar la demanda, el demandado-apelante, Durán Cruz, admitió que se llevó a cabo la transacción de compraventa antes mencionada, además de que existe un tubo que pasa por debajo del solar. Negó, sin

embargo, que el tubo pase por el medio del solar y que sea un "*defecto oculto*". Negó también que la escritura de compraventa requiera que en el solar se construya una casa. En cuanto a los llamados "*defectos ocultos*", Durán Cruz argumentó que Rivera Rivera conocía sobre la existencia del tubo. Por otro lado argumentó entre sus defensas afirmativas que la demanda estaba prescrita. Por cierto, el 9 de diciembre de 1996, Durán Cruz radicó una moción en la que solicitó que se dictara sentencia sumaria. Allí expuso, en síntesis, que la acción estaba prescrita bajo cualquier ley aplicable, además de que los alegados vicios de la propiedad eran aparentes. El tribunal declaró sin lugar la referida solicitud de sentencia sumaria.

Luego del descubrimiento de prueba correspondiente, el Tribunal de Primera Instancia celebró la vista en su fondo durante los días 1 y 2 de abril de 1998. Por la parte demandante testificó el propio demandante Rivera Rivera, su esposa Marena Otero Martínez, el ingeniero Víctor Santini, el señor Francisco Pérez, el ingeniero Jorge Colón, y como prueba pericial, el ingeniero Carlos R. Sierra y el médico psiquiatra Gerardo Tejedor. Por la parte demandada testificó el demandado Durán Cruz, y su perito, el ingeniero Francisco A. Miranda. Las partes también presentaron prueba estipulada, prueba documental y otra prueba presentada por cada una de las partes.

Las conclusiones de hechos a las que llegó el Tribunal de Primera Instancia son las siguientes:

*"1. Mediante la escritura número catorce del 18 de enero de 1990, otorgada ante el notario Wilfredo Picorelli Osorio, las partes en el presente caso contrataron la compraventa del solar marcado con el número veinte del Barrio Las Cuevas del Término Municipal de Trujillo Alto. La cabida del solar es de 1201.5468 metros cuadrados.* ***Está afecto con sus colindantes Norte, Sur, y Oeste por una servidumbre pluvial con un ancho de tres metros.*** *La otra servidumbre a la que está sujeta esta propiedad es una en equidad para que sobre el solar no se construya estructura alguna que no fuese permanente, en específico, estructuras en madera u otras de material fungible. En uno de los planos sometidos este solar se identifica como el número veinte (20). Dicha propiedad, conforme la Certificación Registral presentada por la parte demandante, fue debidamente inscrita en el registro de la propiedad a nombre del demandante."*

*2. La compraventa de la referida finca fue por el precio de $41,554.00, de los cuales el demandado recibió $8,500.00 al momento de otorgarse la escritura, y sobre el balance de $33,054 se suscribió un pagaré al portador a vencerse en diez años con intereses al 11%, pagadero dicho principal e interés en plazos mensuales de $455.48. Cantidad que ha venido satisfaciendo el comprador, señor Rivera.*

*3. Antes de la compraventa al Sr. Angel Rivera* ***se le mostró el plano para la inscripción de los solares,*** *y en una o dos ocasiones visitó el referido solar e inspeccionó el mismo caminando y mirando sus alrededores.*

*4. A finales de 1994, cuando el Sr. Angel Rivera y su esposa comienzan a realizar algunas labores para comenzar la construcción de su residencia, es que el Sr. Francisco Pérez les señala que no pueden construir en el centro del solar debido a que por el mismo pasaba un* ***tubo pluvial.*** *El mismo, según la prueba de ambas partes, está alrededor de diez pies de profundidad.*

*5.* ***En la escritura de compraventa ni en el registro de la Propiedad, ni en los planos que se sometieron a la Administración de Reglamentos y Permisos, en adelante ARPE, para la aprobación del proyecto, aparece servidumbre pluvial alguna que transcurra por el mismo centro del solar número veinte.*** *La misma es una servidumbre no aparente y consiste de un tuvo [sic] corrugado de alrededor de treinta pulgadas de diámetro que atraviesa de norte a sur en forma subterránea el solar número veinte objeto de la siguiente reclamación. Además, existe en el mismo solar el desagüe o "manhole" del referido tubo pluvial.*

*6. El referido tubo en cuestión fue colocado antes de 1990, y se hizo para que sirviera de desague [sic] de un manantial que existía en el área. El mismo solar número veinte colinda con una quebrada, luego de la cual*

*existe un talud con un nivel mucho más alto que el solar número veinte. De hecho, con relación a los demás solares desarrollados en esa misma área, el solar número veinte es el último, siendo el de más bajo nivel.*

*7. Hay inconsistencia en cuanto a cuándo en efecto tuvo conocimiento la parte demandante de la existencia del tubo en cuestión.*

*8. Aquilatada la prueba, el Tribunal determina que el demandante advino en conocimiento de la existencia del referido tubo en enero de 1995.*

*9. Luego de lo anterior, el demandante se comunicó con el Sr. Manuel Durán Cruz para hacerle saber su inconformidad con relación a la existencia de las condiciones ya mencionadas, y que las mismas constituian un incumplimiento del contrato, por cuanto el solar no se había comprado con las referidas condiciones.*

*10. El Sr. Manuel Durán Cruz acordó con Angel Rivera que procedería con la remoción del tubo. De hecho, se nombró al ingeniero Jorge Colón, quien en juicio testificó que efectivamente había emitido una certificación con fecha de 1 de marzo de 1995, y se reafirmó en todo el contenido de la misma. En su certificación, el ingeniero Colón señaló que ha sido designado para las obras de remoción de* ***tubería pluvial*** *en la propiedad del señor Angel Rivera, y que una vez concluidos los trabajos a satisfacción "se certificará que el área en cuestión es apta para la construcción de edificios". De la misma certificación del ingeniero Jorge Colón, inspector contratado y pagado por la misma parte demandada, se puede concluir que el área tal y como estaba no era apta para la construcción de edificios. El contenido de dicha certificación no fue cuestionado por la parte demandada ni fue negado por el ingeniero Colón.*

*11. La parte demandada alegó y trajo prueba de que intentaron remover el referido* ***tubo pluvial*** *y que el señor Angel Rivera se negó. El señor Durán admitió que no hubo ninguna comunicación escrita por parte del señor Durán hacia el señor Rivera notificándole día y hora en que se realizarían las obras. No obstante, la prueba testifical estableció que cuando en efecto se fue a realizar el trabajo de remoción del tubo, el demandante se opuso por razón de que se había incoado esta acción.*

*12. Se le planteó al tribunal que no se puede construir una residencia de hormigón y cemento sobre la* ***tubería pluvial*** *en el solar, o que de hacerlo, sería sumamente costoso, por razón de la existencia del referido tubo.*

*13. Cada parte sentó a testificar a su propio perito. El perito de la parte demandante, Ingeniero Carlos Sierra testificó que sí se podría construir pero que habría que tomar en cuenta unas consideraciones adicionales con relación a la profundidad de la zapata de la casa, las losas estructurales que se utilizarían, y la flexibilidad que tendrían que tener todas las conexiones eléctricas, pluviales, sanitarias y de agua potable, complicarían y aumentarían los costos de construcción.*

*14. El perito de la parte demandante, ingeniero Carlos Sierra, señaló que sería imperativo realizar más estudios geotécnicos para, aun tomando en consideración todos los aspectos que mencionó en su testimonio y en su informe, se reduzca a un mínimo el riesgo de que una construcción ordinaria de una residencia para una familia de cuatro o cinco personas pueda colapsar.*

*15. El Sr. Francisco Alberto Miranda Amoró, ingeniero civil con especialidad en estructuras y constructor, testificó que analizó el efecto que podría tener la construcción de una residencia en el área donde se encontraba la tubería de descarga de obras [sic]. Testificó que alrededor de mayo de 1995, el señor Durán tenía un digger para hacer los trabajos de extracción del tubo. Tomó las medidas de un cunetón o área de drenaje al costado del solar (11 pies). Cotejó que la excavación no produjo derrumbe, que el material estaba bien compactado, que satisfacía los valores de capacidad de sustracción de arcilla, que la tubería no estaba*

*descargando agua, y que la Clasificación A-27 (arcilloso del terreno) quizás hace que no esté descargando adecuadamente las aguas que discurren superficialmente sobre él.*

*16. Concluyó que se puede construir en el solar sujeto a que se concediesen los permisos correspondientes y el Ingeniero supervisara la obra. Recomendó además, que el tubo en controversia debía ser removido.*

*17. La prueba pericial establece que el solar es apto para construir, una vez se removiera el tubo en cuestión y se rellene el área afectada. La prueba estableció que por dicho tubo no discurren aguas, toda vez que el demandado había hecho trabajos para tapiar, tapar o eliminar el discurrir de las aguas por dicho tubo y que se reorientaron por un canal aledaño al solar.*

*18. Esto nos lleva a la última reclamación del demandante de que el predio está afectado por las escorrentías de los predios superiores, por éste quedar en un nivel inferior.*

*19. Es de aplicación la doctrina del predio dominante y el predio sirviente, el cual recibe las aguas del predio dominante. Al momento del demandante adquirir dicho predio y transcurridos más de cinco años (5) años desde que adquiere el mismo y habiéndolo visitado en múltiples ocasiones, según el testimonio desfilado, resulta obvio que conocía o debió haber conocido que las aguas por su propia naturaleza, discurren de los predios superiores a los inferiores. Siendo el suyo el último solar de esa línea o hilera de solares, y quedando a nivel inferior de los demás, ciertamente se afecta por el discurrir natural de las aguas."*

Sentencia Apelada, págs. 3-9; Ap. Apel., págs. 4-10; énfasis suplido.

A raíz de las anteriores determinaciones de hecho, el Tribunal de Primera Instancia resolvió que el demandante-apelado, Rivera Rivera, tiene derecho a recibir una indemnización ascendente a $13,851.00, además de las costas del litigio y honorarios de abogado. El tribunal fundamentó su determinación en las disposiciones legales que regulan las opciones que tiene un comprador contra el vendedor por defectos en la cosa vendida. En cuanto a la figura de la acción por vicios ocultos (Artículo 1373 del Código Civil, 31 L.P.R.A. sec. 3841), el tribunal concluyó que en este caso la acción estaba prescrita de acuerdo a las disposiciones del Artículo 1375 del Código Civil, *id.*, sec. 3843, pero que aún así el demandante-apelado no quedaba huérfano de un remedio legal.

En segundo lugar, el tribunal mencionó el Artículo 1372 del Código Civil, *id.*, sec. 3840, referente a las cargas o servidumbres no aparentes. Al aplicar dicho artículo a los hechos de este caso, el Tribunal de Primera Instancia concluyó que no procede la rescisión del contrato por cargas o servidumbres no aparentes, ya que la misma también prescribió. Sin embargo, el tribunal aplicó la última oración del antes citado artículo, por lo que resolvió lo siguiente:

*"A pesar de lo anterior, nuestro Derecho Civil no deja desprovisto al comprador de indemnización por servidumbres no aparentes. Luego de transcurrir dicho año, éste pudo solicitar la indemnización dentro de un período igual desde el día que haya descubierto la carga o servidumbre, 31 L.P.R.A. §3840, supra. Habiéndose interpuesto la acción por cargas y servidumbres no aparentes de la finca objeto del presente litigio dentro del término de un (1) año, luego del demandante haber descubierto la misma, procede la indemnización.*

*Fue un hecho probado que el demandante desconocía la existencia de la servidumbre no aparente y que de haberlo sabido pudo no haber comprado o haber comprado a un precio menor, toda vez que todos los peritos están de acuerdo en que la servidumbre existente es una carga que afecta negativamente el inmueble por el cual discurre, al punto que, aunque no lo inhabilita para construir, requiere de la remoción del tubo en cuestión, rellenar y compactar el área o de invertir más dinero para hacer viable la construcción de una residencia, fin para el que se adquirió el mismo.*

*No procede la rescisión, pero s[í] procede la indemnización a favor del demandante."*

Sentencia Apelada, págs. 12 y 13; Ap. Apel., págs. 13 y 14.

Para determinar el monto de la indemnización a pagarse al demandante-apelado, el tribunal utilizó una fórmula citada en el caso *Administración de Terrenos de P.R. v. Nerashford Development Corp.*, 136 D.P.R. 801 (1994). El Tribunal de Primera Instancia tomó en consideración el precio de compraventa como el justo valor en el mercado de la propiedad sin tomar en consideración las cargas o servidumbres que cargan la misma. Sentencia Apelada, págs. 13 y 14; Ap. Apel. págs. 14 y 15. Así, el tribunal fijó la cantidad de la indemnización en $13,851.00.

En cuanto a la reclamación por daños morales presentada por Rivera Rivera, el tribunal resolvió que la prueba ofrecida con relación a los alegados sufrimientos morales no fue suficiente para probar la existencia de un daño apreciable que necesitase reparación. Por esa razón determinó el tribunal que no procede la reclamación por daños y angustias mentales.

Inconforme con la sentencia dictada, el demandado Durán Cruz acude ante nos mediante recurso de apelación. Alega que el tribunal erró: (1) al declarar sin lugar la moción de sentencia sumaria en la que se alegó prescripción de la causa de acción; (2) al apreciar la prueba y determinar que el demandado-apelado, Rivera Rivera, advino en conocimiento del tubo en enero de 1995; (3) al aplicar el Artículo 1372 del Código Civil, *supra*; (4) al aplicar el Artículo 1372 del Código Civil, *id.*, aun cuando bajo dicho artículo la causa de acción se encuentra prescrita; (5) al ordenar una indemnización en ausencia total de prueba; y (6) al aplicar una fórmula de indemnización creada y arbitraria.

Contando con la comparecencia de ambas partes y con el beneficio de la exposición narrativa estipulada de la prueba, resolvemos.

## II

Cuando una persona adquiere una cosa es porque pretende obtener de ella algún beneficio o utilidad. Por esa razón, el Derecho ampara al comprador cuando la cosa adquirida no es susceptible de rendir la utilidad que de ella se espera, ya sea porque algún vicio o defecto lo impide, o cuando las pretensiones del adquiriente se ven frustradas por reclamaciones de terceros que pretenden ser los verdaderos dueños o poseedores de la cosa objeto de la compraventa. José Ramón Vélez Torres, *Curso de Derecho Civil-Derecho de Contratos*, San Juan: Revista Jurídica de la Universidad Interamericana de Puerto Rico, Tomo IV, Vol. II, 1990, pág. 176.

El Artículo 1350 del Código Civil, *supra*, sec. 3801 dispone: "*El vendedor está obligado a la entrega y saneamiento de la cosa objeto de la venta*". En virtud del saneamiento que dispone el Artículo 1350, *id.*, el Código Civil dispone que el vendedor responderá al comprador: (1) de la posesión legal y pacífica de la cosa vendida, y (2) de los vicios ocultos que tuviere. Por tanto, el saneamiento se define como una obligación que contrae el vendedor de procurar al comprador la posesión pacífica y útil de la cosa, y de indemnizarle de los daños y perjuicios en el caso de que aquel compromiso no obtenga cumplimiento. José Castán Tobeñas, *Derecho Civil Español, Común y Foral*, Madrid: Editorial Reus, 15ta. ed., Tomo IV, pág. 121.

Existen tres tipos de saneamiento contemplados en el Código Civil. El primero de ellos es el saneamiento por evicción (perturbación jurídica del derecho dominical adquirido), el cual tiene lugar cuando se priva al comprador, por sentencia firme y a virtud de un derecho anterior a la compra, de todo o parte de la cosa comprada. Artículo 1364 del Código Civil, *supra*, sec. 3832.

El Artículo 1373 del Código Civil, *supra*, sec. 3841, regula el llamado saneamiento por vicios ocultos. Consiste de aquella situación que se produce cuando, después de verificada la entrega, se observa que la cosa

vendida tiene vicios ocultos que la hacen impropia para los usos a que se destina o disminuyen de tal modo su utilidad que, de haberlos conocidos el comprador, no la hubiese adquirido o habría dado menos precio por ella. El Tribunal Supremo de Puerto Rico ha mencionado que los defectos o vicios ocultos en la cosa vendida pueden ser jurídicos, *"en cuyo caso consistirán en una limitación del derecho transmitido* ***(como por ejemplo una servidumbre no aparente en caso de un inmueble)*** *o pueden ser de hecho, como cuando se trata de defectos intrínsecos de la cosa vendida". Ferrer v. General Motors Corp.*, 100 D.P.R. 246, 255 (1971); énfasis suplido.

La acción de saneamiento por vicios ocultos tiene dos vertientes por las que el comprador puede optar. En la acción redhibitoria, el comprador elige la rescisión del contrato que consiste en devolver el objeto y recibir el precio pagado, y en adición puede obtener indemnización de daños si el vendedor conocía el vicio. *Márquez v. Torres Campos*, 111 D.P.R. 854, 862 (1982). En la acción estimatoria o *quanti minoris*, el comprador elige recibir una rebaja del precio en atención a la disminución de valor ocasionada por el defecto. *Id.*

En cuanto al plazo prescriptivo de seis meses dispuesto en el Código Civil para el ejercicio de la acción por vicios ocultos, el Tribunal lo ha extendido jurisprudencialmente. Sobre este particular se ha dicho que *"el plazo de seis meses se cuenta, no desde la fecha de perfección del contrato, sino desde el día en que se interrumpieron las gestiones de inteligencia entre las partes". Id.*, a la pág. 256; *Casa Jaime Corp. v. Castro*, 89 D.P.R. 702, 704 (1963). Véase además, D. José María Manresa y Navarro, *Comentarios al Código Civil Español*, Madrid: Editorial Reus, 7ma. ed., Tomo IV, 1972, pág. 335.

En tercer lugar, se encuentra el llamado saneamiento por gravámenes ocultos dispuesto en el Artículo 1372 del Código Civil, *supra*, sec. 3840. Dicho artículo lee de la siguiente manera:

*"Si la finca vendida estuviese gravada, sin mencionarlo la escritura,* ***con alguna carga o servidumbre no aparente****, de tal naturaleza que deba presumirse no la habría adquirido el comprador si la hubiera conocido, podrá pedir la rescisión del contrato, a no ser que prefiera la indemnización correspondiente.*

*Durante un (1) año, a contar desde el otorgamiento de la escritura, podrá el comprador ejercitar la acción rescisoria o solicitar la indemnización. Transcurrido el año, sólo podrá reclamar la indemnización dentro de un período igual, a contar desde el día que haya descubierto la carga o servidumbre."*

Según se desprende de dicho artículo, los requisitos para el ejercicio de la acción que éste contempla son: (1) la existencia de una servidumbre no aparente; (2) su falta de manifestación en la escritura; y (3) la circunstancia que de haberse conocido el gravamen, el comprador no hubiese adquirido la finca. Las disposiciones de este artículo se derivan de la obligación de saneamiento del vendedor y se dirige a garantizar la posesión pacífica de la cosa vendida, oponiéndose a cualquier defecto material o jurídico que afecte la posesión de la misma. *Miralli v. Fullana,* 98 D.P.R. 330, 335 (1970). Castán nos dice que aunque el Código Civil incluye esta materia dentro de las disposiciones del saneamiento por evicción, él cree más adecuada su colocación dentro del saneamiento por vicios ocultos, ya que el reconocimiento de la carga oculta no implica privación de la cosa ni requiere sentencia ejecutoria. Castán, *supra*, pág. 131. Vélez Torres, por su parte, considera que este artículo 1372, *supra*, constituye una modalidad del saneamiento por evicción parcial, porque *"el gravamen no aparente no puede considerarse un vicio o defecto de la cosa*". Vélez Torres, *supra*, pág. 188.

Por otro lado, Manresa nos comenta que este Artículo no sería de aplicación en aquellos casos en los que existe una servidumbre aparente, puesto que su existencia y ejercicio se revela por signos que la hacen públicamente conocida. Tampoco sería de aplicación en aquellos casos en que existe una servidumbre no aparente que estuviese inscrita en el Registro de la Propiedad, ya que el comprador pudo conocer perfectamente el estado del inmueble vendido. En caso de que el comprador hubiese podido conocer el estado del inmueble vendido, Manresa entiende que éste no tiene derecho a pedir la rescisión del contrato ni la indemnización que contempla el Artículo 1372, *supra*. D. José María Manresa y Navarro, *Comentarios al Código Civil Español*,

Madrid: Editorial Reus, 6ta. ed., Tomo X, Vol. I, 1969, pág. 327.

Se ha dicho que el Artículo 1372, *supra*, es un caso donde es aplicable el concepto del error en el consentimiento, ya que se concede la acción rescisoria o la indemnización sólo "*cuando la carga o servidumbre no aparente sea de tal naturaleza que deba presumirse que el comprador no habría adquirido la cosa si la hubiera conocido*". *Id.*, a la pág. 329. Cónsono con lo anterior, el Tribunal Supremo de Puerto Rico resolvió que las disposiciones provistas en el Artículo 1372, *supra*, están subordinadas a los principios de legalidad, publicidad y especialidad que informan el derecho registral. Por lo tanto, aquél que no consulta el Registro, no tendrá derecho a pedir rescisión del contrato ni indemnización. *García Larrinua v. Lichtig*, 118 D.P.R. 120 (1986); *García v. Rafael Durand & Assocs.*, 114 D.P.R. 440, 444 (1983).

III

Dado el hecho de que el Artículo 1372, *supra*, se refiere a cargas o servidumbres no aparentes, procede entonces determinar en qué consisten dichas figuras. La servidumbre es un gravamen impuesto sobre un inmueble en beneficio de otro perteneciente a distinto dueño. El inmueble a cuyo favor está constituida la servidumbre, se llama predio dominante; el que la sufre, predio sirviente. Artículo 465 del Código Civil, 31 L.P. R.A. sec. 1631; *Díaz v. Con. Tit. Cond. El Monte N. Garden,* 132 D.P.R. 452, 459 (1993).

Con mayor precisión también se ha dicho que la servidumbre es un:

*"**gravamen impuesto sobre un inmueble en beneficio de otro perteneciente a distinto dueño** y en cuya virtud el titular del predio dominante puede utilizar el predio sirviente para ciertas finalidades o poner al aprovechamiento del mismo limitaciones que redundan en beneficio de su particular dominio, o privar al dueño del predio gravado de alguna especial facultad contenida en el derecho de propiedad normalmente constituido".*

Manresa, *supra*, Tomo IV, a la pág. 709; énfasis suplido.

Las servidumbres pueden clasificarse de distintas maneras, según el criterio clasificador que se utilice. Además, reglas distintas gobiernan la adquisición y la extinción de las diferentes clases de servidumbres. *Ibáñez v. Tribunal Superior*, 102 D.P.R. 615, 624 (1974).

Por razón de las formas de disfrutarse, hay servidumbres continuas y discontinuas. Son continuas aquellas servidumbres cuyo uso es o puede ser incesante sin la intervención de ningún hecho del hombre. Son discontinuas las que se usan a intervalos más o menos largos y dependen de actos del hombre. Luis Díez Picazo y Antonio Gullón, *Sistema de Derecho Civil,* Madrid, Editorial Tecnos, S.A., 6ta. ed., Vol. III, 1997, pág. 438. Por su exteriorización, las hay aparentes y no aparentes. Por la manera de ejercerse, las hay positivas y negativas. Una servidumbre positiva implica que el dueño del predio sirviente tiene la obligación de dejar hacer alguna cosa o la de hacerla por sí mismo. La servidumbre negativa, por su parte, significa que al dueño del predio sirviente le está prohibido hacer algo que le sería lícito si no existiera la servidumbre. *Id.*, pág. 437.

El Código Civil recoge la distinción entre las servidumbres aparentes y no aparentes en los dos últimos párrafos del Artículo 468 del Código Civil, 31 L.P.R.A. sec. 1634. Son servidumbres aparentes las que se anuncian y están continuamente a la vista por los signos exteriores que revelan su uso o aprovechamiento. Por su parte, las servidumbres no aparentes son las que no presentan indicio exterior de su existencia.

Para que una servidumbre se repute como aparente, se requiere un signo exterior visible y permanente, que por sí mismo indique la existencia de la servidumbre. Debe ser un signo claro, evidente, que sin género alguno de duda denuncie que hay una servidumbre en ejercicio y la naturaleza de ésta. D. José María Manresa y Navarro, Tomo IV, *supra*, pág. 724.

Otros tipos de servidumbre son las voluntarias y las forzosas o legales. Las voluntarias son las establecidas en una finca por su propio propietario. Artículo 530 del Código Civil, *supra*, sec. 1821. En cambio, las legales son las impuestas por ley que pueden tener por objeto la utilidad pública o el interés de los particulares. Artículo 485 del Código Civil, *id.*, sec. 1701.

## IV

Cuando las servidumbres impuestas por ley tienen por objeto la utilidad pública o comunal, se rigen, en primera instancia, por las leyes y reglamentos especiales que las determinen. El Código Civil en esos casos actúa como un cuerpo legal supletorio. Artículo 486 del Código Civil, *id.* sec. 1702; *Paoli Méndez v. Rodríguez*, 138 D.P.R. 449 (1995); *Borges v. Registrador*, 91 D.P.R. 112 (1964).

A tenor con lo anterior, la Ley Núm. 143 de 20 de julio de 1979, según enmendada, 27 L.P.R.A. sec. 2151 *et. seq.*, establece las servidumbres legales de servicio público de paso. La Sección 1 de dicha ley establece que tienen carácter de servidumbre legales, continuas y aparentes, las servidumbres de servicio público de paso de energía eléctrica, de paso de líneas telefónicas y de instalaciones de acueductos y alcantarillados pluviales y sanitarios, incluyendo sus equipos, estructuras y accesorios, sean éstas aéreas, sobre la superficie o soterradas.

De acuerdo a la Sección 3 de la Ley 143, *supra*, las entidades públicas que rinden los servicios públicos de energía eléctrica, teléfono, y acueducto y alcantarillado sanitario, por las cuales se establecen las servidumbres legales, aprobarán y promulgarán los reglamentos que regirán el uso y disfrute de dichas servidumbres. Por otro lado, la ley dispone que la Junta de Planificación adoptaría las reglas y reglamentos que regirán el uso y disfrute de la servidumbre de desagüe pluvial que ofrecen los Municipios de Puerto Rico.

Así pues, a tenor con la Ley 143, *id.*, la Junta de Planificación aprobó el Reglamento sobre Servidumbre de Paso de Alcantarillado y Desagüe Pluvial Número 2734 de 26 de diciembre de 1980. La Sección 1.03 de dicho Reglamento establece que sus disposiciones cubrirán, entre otros, todo proyecto de desarrollo o urbanización de terrenos, de construcción de edificios, de lotificación simple en que por la forma principal o los solares discurran o se requiera instalar los servicios de desagüe y de alcantarillado pluvial que apruebe la Administración de Reglamentos y Permisos (ARPE). De acuerdo a la Sección 2.02 del Reglamento Núm. 2734, un alcantarillado pluvial es un sistema compuesto por alcantarillas, colectoras, zanjas, canales, tajeas y demás instalaciones accesorias que funcionan como una unidad para el recogido, transportación, disposición y desagüe de las aguas pluviales.

La Introducción al Reglamento Núm. 2734 nos dice que para viabilizar que los sistemas de alcantarillado pluvial se instalen y se mantengan adecuadamente, es necesario establecer servidumbres a lo largo del mismo, en donde la entidad a cargo del sistema, los municipios, tengan derecho de acceso y de operar y mantener el mismo. Nos dice también que la Ley Núm. 143, *supra*, tiene como objetivo establecer una forma sencilla de constituir las servidumbres pluviales y su registro a nombre de los municipios. Una servidumbre pluvial se define como aquella franja o franjas de terreno a ser utilizadas para la instalación y conservación del sistema de alcantarillado o desagüe pluvial, que son descritas gráficamente en los Planos de Inscripción y que están sujetas a las definiciones de este Reglamento. Sección 2.15 del Reglamento Núm. 2734; énfasis suplido.

Para que el Registrador de la Propiedad inscriba, a favor del municipio, los derechos de servidumbres pluviales que afecten la finca o los solares a formarse, bastará la presentación en el Registro de: (1) certificación debidamente autenticada ante notario, expedida por ARPE, en que se constituyan las servidumbres pluviales, haciendo constar específicamente las fincas o los solares afectados, los dueños, la naturaleza de la servidumbre y el municipio titular del derecho; (2) planos de inscripción aprobados por ARPE y donde se ilustren gráficamente las servidumbres pluviales, los cuales se archivarán en el Registro de la Propiedad junto a la certificación.

La Sección 3.07 del Reglamento Núm. 2734 dispone, además, que será obligación de todo propietario urbanizador incluir una cláusula en cada escritura individual de compraventa de aquellos solares afectados por una servidumbre pluvial, en que se establezca que tal solar está gravado con una servidumbre pluvial y se describa la forma física en que afecta el solar. Propietario, proyectista o urbanizador se define en la Sección 2.13 del Reglamento Núm. 2734, *id.*, como "*toda persona, natural o jurídica, nativa o foránea, que sea dueña en pleno dominio de los terrenos a ser gravados o autorizado a desarrollar terrenos y a gravarlos con las servidumbres pluviales objeto de este Reglamento*".

Cónsono también con la aprobación de la Ley Núm. 143, *supra*, la Autoridad de Acueductos y Alcantarillados aprobó el Reglamento de Servidumbres de Paso de Acueductos y Alcantarillados mediante la Resolución Núm. 962 del 29 de noviembre de 1979 (Reglamento Núm. 2667). Dicho reglamento se creó con el propósito de regir el establecimiento, constitución, uso y disfrute de las servidumbres de paso para el servicio público de acueductos y alcantarillados.

En la Sección 3.00 del mencionado reglamento, se dispone que en todo proyecto en que fueren requeridas para el paso, instalación, operación, conservación y reparación de los sistemas públicos de acueductos y alcantarillados o para el emplazamiento e instalación de tuberías, estructuras, equipos, aditamentos y otros accesorios o artefactos necesarios o convenientes a dicho sistema, se constituirán servidumbres de paso de acueductos y alcantarillados por los lindes o a través de fincas, solares o áreas dedicadas o reservadas para uso público, en las etapas y formas en que aparezcan gráficamente demostradas en los planos aprobados por la Autoridad.

De acuerdo a la Sección 4.01 del Reglamento, *id.*, toda servidumbre de paso de acueductos y/o alcantarillados, será debidamente descrita mediante su delimitación en los planos de inscripción que para el proyecto apruebe ARPE y como tal quedará constituida sobre el predio gravado.

## V

En sus determinaciones de hechos, el Tribunal de Primera Instancia llegó a la conclusión de que el solar adquirido por el demandante-apelado, Rivera Rivera, existe un tubo pluvial que lo atraviesa de norte a sur en forma subterránea. Por otro lado, determinó el tribunal que en el solar también se encuentra el desagüe del referido tubo. El demandado apelante, Durán Cruz, no pone en entredicho dichas determinaciones de hechos, sino al contrario, argumenta ante nos que al momento de la compraventa el demandante-apelado conocía de la existencia del referido tubo pluvial y su correspondiente desagüe.

Entre los documentos ante nuestra consideración, se encuentra una Resolución de ARPE de 6 de mayo de 1990 en la que se autorizó la inscripción de varios solares (entre ellos el solar número 20, objeto de este pleito). Dichos solares forman parte de una lotificación para la cual se aprobaron unas obras de urbanización. De la resolución antes mencionada, se desprende que ARPE recibió por parte de la AAA una comunicación en la que le informó que las obras hidráulicas fueron construidas y se esterilizaron las obras de acueducto. También se desprende que ARPE recibió una certificación de que el Ing. Víctor Santini inspeccionó las obras y que el contratista Juan Batista Pérez indicó que las obras de urbanización se ejecutaron conforme a los planos. Por último, el Municipio de Trujillo Alto indicó que las obras fueron constituidas de acuerdo a los planos y que se cumplieron con los requisitos del municipio. Apéndice Alegato del Demandante-Apelado, pág. 25.

No obstante lo anterior, de los documentos ante nos surgen varias discrepancias. La Resolución de ARPE a la que hicimos referencia se expidió en mayo de 1990; sin embargo, la compraventa del solar número 20 se efectuó en enero de ese mismo año. En la escritura de compraventa entre Rivera Rivera y Durán Cruz se desprende que el solar está afecto a una servidumbre pluvial de tres metros (3.00) en sus colindancias Norte, Sur y Oeste. Ap. Apel., a la pág. 24. Por otro lado, el solar se encuentra afecto a una servidumbre en equidad en la que se establece que en el mismo no se pueden construir estructuras que no fuesen permanentes. En la

escritura en ningún momento se mencionó que el solar estaba afecto a un tubo pluvial que transcurriera por el mismo centro del solar. *Id.*

De la Certificación Registral de la inscripción del solar número 20, tampoco surge que el mismo esté afecto a un tubo pluvial que le atraviese por el mismo centro. El solar se encuentra inscrito como Finca Núm. 25,323, Tomo 478, Folios 190 al 191 del Registro de la Propiedad, Sección Cuarta de San Juan. Ap. Apel., págs. 102-104. De ello se puede inferir razonablemente que de los documentos complementarios presentados al Registro de la Propiedad, junto a la escritura de compraventa, tampoco se encontraba constancia de un tubo pluvial que atravesare dicho solar. Ello se sustenta aún más con la determinación de hecho del Tribunal de Primera Instancia en el sentido de que en los planos sometidos ante ARPE para la aprobación del proyecto no aparece servidumbre pluvial alguna con esas características. Esa determinación de hecho tampoco fue cuestionada por el demandado-apelante, Durán Cruz.

De las leyes y reglamentos antes mencionados surge con claridad una política pública de que las servidumbres legales llamadas pluviales, y de acueductos y alcantarillados, tienen que estar debidamente descritas en las escrituras de compraventa y explicada la forma física en las que éstas afectan la propiedad.

Por lo antes expuesto, entendemos que el tubo pluvial que atraviesa el solar del demandado-apelante debió aparecer inscrito en la escritura de compraventa y en los planos del referido solar. De acuerdo a las determinaciones de hechos del Tribunal de Primera Instancia, varios de los testigos clasificaron el tubo como uno pluvial. █ Por otro lado se determinó que tal vez por lo arcilloso del terreno, el tubo no se encontraba descargando adecuadamente las aguas que discurren superficialmente sobre él. Determinación de Hechos Núm. 15; Sentencia Apelada pág.7; Ap. Apel., pág. 8.

Es preciso indicar, además, que del testimonio del señor Francisco Pérez surge que el tubo en controversia "***viene desde arriba y pasa por el solar de Secundino y Angel Rivera***". Indicó también que "*el tubo se colocó porque en dicho lugar había un manantial hace mucho tiempo, el cual ya no existe; que siempre había agua aquí y **se compró esa tubería `provisionalmente´ para sacar el agua mientras se hacían las facilidades***". E.N.P., pág. 8. Declaró también que "*según el libro de diseño del Reglamento de Aguas Pluviales no se podía poner ese tubo por aquí por lo que se puso acá*". *Id.* Declaró además que en el año 1990 "***no estaba lloviendo mucho***" y que el señor Batista le dijo que **podrían haber problemas en el futuro**. E.N.P., pág. 9; énfasis suplido. Es importante destacar, además, que el señor Carlos R. Sierra, P.E. de Jaca & Sierra Testing Laboratories, opinó luego de la inspección que realizó en el terreno, que no entendía la presencia del tubo en el lugar, su uso, o porqué el mismo no está indicado como una servidumbre, la cual debía estar debidamente registrada. Apéndice Alegato del Demandante-Apelado, pág. 14; Véase además, E.N.P., pág. 5.

Esto último nos lleva a la alegación del demandado-apelante, Durán Cruz en el sentido de que dicho tubo no es una servidumbre. A base de todo lo antes mencionado, el tubo pluvial, de haber sido debidamente inscrito constituiría una servidumbre legal. Ahora bien, como ya vimos, en los documentos pertinentes no aparece constancia de la existencia del mencionado y denominado "*tubo pluvial*". Ante esa circunstancia, no podemos imputarle a Rivera Rivera el conocimiento de la existencia del referido tubo al momento de la compraventa.

Durán Cruz argumenta ante nos que el Tribunal de Primera Instancia erró al apreciar la prueba y al determinar que el demandante-apelado advino en conocimiento del tubo en el 1995. Es norma de derecho ampliamente conocida que en ausencia de pasión, prejuicio, parcialidad o error manifiesto, el foro apelativo no está autorizado a intervenir con la apreciación de la prueba realizada por el Tribunal de Primera Instancia. *Flores v. Soc. de Gananciales*, Opinión de 30 de junio de 1998, **98 J.T.S. 96**; *Belk Arce v. Martínez*, Opinión de 30 de junio de 1998, **98 J.T.S. 92**. Asimismo, tampoco podemos intervenir con la adjudicación de credibilidad de los testigos, realizada por el tribunal si tampoco hay presencia de pasión, prejuicio, error manifiesto o parcialidad. *López Vicil v. I.T.T. Intermedia*, 142 D.P.R. 857 (1997). El juez sentenciador, ante quien deponen

los testigos, es quien tiene la oportunidad de verlos y observar su manera de declarar, de poder apreciar sus gestos, titubeos, contradicciones, manerismos, dudas, vacilaciones y por consiguiente, de ir formando gradualmente en su conciencia la convicción en cuanto a si dicen la verdad. *Argüello v. Argüello*, Opinión de 31 de agosto de 2001, **2001 J.T.S. 127**.

De las alegaciones de las partes se derivaba una controversia en cuanto al momento en que Rivera Rivera advino en conocimiento del tubo pluvial que atraviesa su propiedad y de que el desagüe del referido tubo se encontraba dentro de su propiedad. Rivera Rivera alegó que advino en conocimiento de los hechos en el año 1995; cuando el señor Francisco Pérez le informa al respecto; cuando realizó una nueva mensura del solar número 20 en la que se reveló que el desagüe quedaba fuera y no dentro del solar (Ap. Apel., pág. 72 y 74), y cuando se realizó una excavación en el referido terreno. Ap. Apel., págs. 68-69. En sentido contrario, la parte demandante alegó que el tubo y el desagüe fueron "*defectos manifiestos*" conocidos por Rivera Rivera desde antes de la compraventa. La dilucidación de ese detalle era de suma importancia para determinar el momento en que comenzarían a decursar los términos prescriptivos correspondientes.

El Tribunal de Primera Instancia, al aquilatar toda la prueba documental y testifical presentada, llegó a la conclusión de que Rivera Rivera advino en conocimiento del tubo en enero de 1995. Al así hacerlo no sólo le dio peso y valor a la escritura de compraventa y al plano del solar, sino que también creyó el siguiente testimonio del demandante-apelado Rivera Rivera:

*"...a finales del año 1994, estaba limpiando el solar y que el señor Francisco Pérez se acercó y le señaló que porque [sic] no hacía la zapata en otro lugar; que él le replicó que quería la casa en dicho lugar y que el señor Pérez le dijo que en dicho lugar no podía hacer la zapata porque pasaba un tubo pluvial que atravesaba la* ***propiedad a lo largo****. Declaró que habló en forma cordial con el señor Durán como dos veces sobre el tubo. Declaró que hubo una reunión en ARPE a la que él asistió y que se acordó que el señor Durán removería el tubo. Declaró que luego, el 1 de marzo de 1995, el señor Durán le hace llegar la certificación del Ingeniero Colón, pero que luego de eso no pasó nada. Declaró que fue luego de eso,* ***en enero de 1995****, [que] le solicitó ayuda al Municipio de Trujillo Alto,* ***que el municipio realizó una excavación y se encontró el tubo a diez pies de profundidad por quince de largo. Declaró que no hubiese comprado el terreno de haber sabido de la existencia del tubo antes de la compraventa."***

E.N.P., págs. 1 y 2; énfasis suplido.

No vemos error manifiesto, pasión, prejuicio o parcialidad en la determinación de hechos del tribual con respecto al momento en que Rivera Rivera conoció que un tubo pluvial cruza subterráneamente su propiedad y que el desagüe del referido tubo también quedaba dentro de su solar. Por esa razón, no intervendremos con la determinación del tribunal apelado.

## VI

Como indicamos anteriormente, el Artículo 1372 del Código Civil, *supra*, provee dos remedios o acciones que puede ejercitar el comprador, en caso de que la propiedad cuente con una carga o servidumbre no aparente. Estas acciones lo son la rescisión del contrato o la indemnización. Al comentar el Artículo 1483 del Código Civil Español, equivalente al Artículo 1372 nuestro, Manresa nos dice lo siguiente sobre el término prescriptivo de estas acciones:

*"Los dos últimos párrafos del Artículo 1483 se refieren a establecer el plazo de prescripción para el ejercicio de las acciones de que venimos hablando. Este plazo es de un año, a contar desde el otorgamiento de la escritura, y en su defecto, desde el día en que quedó perfeccionada la venta por mutuo consentimiento: tal es la regla general.* ***Pero aun pasado ese año tendrá derecho el comprador a exigir indemnización, siempre que lo ejercite dentro de otro igual plazo de un año, a contar desde el día en que se haya descubierto la carga o***

*servidumbre. De suerte, que pasado el primer año, a partir de la escritura, el contrato no puede prescindirse por el motivo que expresa el Artículo 1483; queda tan sólo a salvo la acción para pedir la indemnización. El hecho del conocimiento de la existencia de la carga o servidumbre para la computación del plazo puede revestir gran interés en la práctica, y de su prueba dependerá muchas veces el éxito de la demanda."*

Manresa, *supra*, Tomo X, págs. 330-331.

Como determinara el Tribunal de Primera Instancia, el demandante Rivera Rivera advino en conocimiento del tubo pluvial en enero de 1995. El contrato de compraventa se efectuó en enero de 1990. Ciertamente, la acción de rescisión no procede, ya que la demanda se interpuso al menos cinco años después del contrato de compraventa. Sin embargo, aún procede la acción de indemnización, ya que la demanda en este caso se interpuso a tan sólo cuatro meses del descubrimiento del tubo y desagüe pluvial. El Código provee un año desde ese momento para interponer esa acción. Por lo tanto, la demanda se interpuso en tiempo. ■

Ahora bien, para determinar la cuantía de la indemnización de valor de la existencia de la carga hay que calcular pericialmente la disminución de valor que la existencia de la carga o gravamen supone para la finca comprada. Manuel Albaladejo y Silvia Díaz Alabart, *Comentarios al Código Civil y Compilaciones Forales*, Madrid, Editorial Revista de Derecho Privado, 2da. ed., Tomo XIX, 1991, pág. 346. De acuerdo a las determinaciones de hechos del tribunal, sí se puede construir en el solar número 20, pero habría que tomar en cuenta la profundidad de la zapata de la casa, las losas estructurales que se utilizarían, la flexibilidad que tendrían que tener las conexiones eléctricas, pluviales, sanitarias y de agua potable. Todo ello complicaría y aumentaría los costos de construcción. Sentencia Apelada, pág. 6; Ap. Apel., pág. 2.

A raíz de lo anterior, el propio tribunal hizo el cómputo para determinar la indemnización correspondiente. Para ello, el tribunal tomó en consideración el precio de compraventa como el justo valor de la propiedad en el mercado, sin tomar en consideración las cargas o servidumbres que cargan la misma. Acto seguido, el tribunal tomó en consideración que el demandante no mitigó daños al no permitir que no se removiera el tubo. Luego, el tribunal hizo un ajuste de una tercera parte del precio de compraventa, lo que según el tribunal fijaba en $13,851.00 la indemnización correspondiente.

Salta a la vista que el monto de la indemnización fue establecida sin contar con un cálculo pericial por lo que no se cumplió con el requisito previamente indicado.

**VII**

En el caso de los daños contractuales, el deber de indemnizar deriva del deber de cumplir, el cual ha sido infringido. Aquél que incumple las obligaciones contraídas o lo hace de forma defectuosa o tardía, queda obligado a indemnizar a los demás los daños y perjuicios que eventualmente le hubiere ocasionado. La indemnización constituye, por tanto, en una manera de reparar los perjuicios que ocasiona al acreedor el incumplimiento de las obligaciones nacidas del contrato y se traduce en una prestación que el deudor queda obligado a satisfacer en su favor. Dr. José A. Cuevas Segarra, *La Responsabilidad Civil y el Daño Extracontractual en Puerto Rico,* **Publicaciones J.T.S.**, 1993, pág. 179.

El Artículo 1054 del Código Civil, *supra*, sec. 3018, dispone que quedan sujetos a la indemnización de los daños y perjuicios causados, los que en el cumplimiento de sus obligaciones incurrieron en dolo, negligencia o morosidad, y los que de cualquier modo contravinieron el tenor de aquéllas.

Para que la reclamación en daños por incumplimiento de contrato pueda prosperar, no basta con que el actor demuestre el incumplimiento de la obligación por el deudor, sino que además debe probar la existencia real y positiva de los daños causados. Cuevas Segarra, *supra*, pág. 185.

En *Pereira v. I.B.E.C.*, 95 D.P.R. 28, 60-61 (1967), el Tribunal Supremo resolvió que de los hechos particulares de ese caso se desprendía que los reclamantes sufrieron daños y perjuicios, y sufrimientos mentales y emocionales, al ver sus residencias en una situación ruinosa. Por lo tanto, resolvió el Tribunal que los demandados eran responsables de los daños morales previsibles. La indemnización de daños morales en este tipo de acción contractual debe ser ponderada cuidadosamente y limitarla a aquellos casos en que el incumplimiento haya afectado en forma apreciable el estado emocional del reclamante. *De Jesús v. Ponce Housing Corp.* 104 D.P.R. 885, 889-890 (1976).

Posteriormente, el Tribunal Supremo ha reiterado que "*para que sean compensables daños morales por incumplimiento de contrato, éstos deben ser apreciables*". *Lameiro v. Dávila,* 103 D.P.R. 834 (1975); *Duchesne v. Ruiz,* 102 D.P.R. 699, 703 (1974).

La prueba presentada por Rivera Rivera para sustentar sus alegaciones sobre los alegados daños sufridos consistió en el testimonio del psiquiatra Gerardo Tejedor. Este declaró que evaluó y atendió al demandante-apelado desde el 7 de marzo de 1997. Anterior a ello, el demandante-apelado, Rivera Rivera, recibió un tratamiento psiquiátrico por parte del Dr. Juan Lastra. E.N.P., pág. 9. El Dr. Tejedor testificó que el demandante-apelado le habló sobre el problema relacionado al tubo que atraviesa su propiedad. E.N.P., págs. 9 y 10. El diagnóstico que hiciera el Dr. Tejedor en cuanto a Rivera Rivera fue el de "*trastorno de ansiedad con rasgos depresivos*". *Id.* Por último, el Dr. Tejedor informó que antes de tratarse con él, Rivera Rivera se atendió con el Dr. Lastra en seis ocasiones entre los meses de marzo de 1995 a diciembre de 1996 y que el diagnóstico del Dr. Lastra fue el de "*trastorno adaptativo y trastorno de ajuste*". *Id.*

Testificó también el Dr. Lastra que cuando comenzó a ver al demandante-apelado, Rivera Rivera, éste mostraba síntomas de insomnio y falta de concentración motivados por el negocio al que se refiere la demanda. E.N.P., pág. 10. Por otro lado, declaró que atendió a Rivera Rivera los días 7, 12 y 21 de marzo de 1997, 18 de abril, 12 de septiembre y 21 de octubre de 1997 y el 6 de febrero y 31 de marzo de 1998. *Id.* A Rivera Rivera se le ofreció psicoterapia y se atacaron los síntomas con medicamentos para controlar el insomnio y terapia y medicamentos para los síntomas de falta de concentración. *Id.* Testificó también el psiquiatra Tejedor que Rivera Rivera se sentía afligido y se veló para que los síntomas no lo hicieran disfuncional. *Id.*

Por otro lado, del Informe de Conferencia con Antelación al Juicio se desprende que la parte demandante-apelada anunció como prueba el informe rendido por el Dr. Tejedor con referencia al diagnóstico y pronóstico de Rivera Rivera. En el referido informe se desprende lo siguiente con relación al renglón de capacidad y pronóstico del paciente:

*"El pronóstico en este caso es reservado. Es pertinente que [é]l se mantenga recibiendo sostén emocional para prevenir de esta forma la aparición de síntomas de ansiedad o depresivos más severos. La meta también de este tratamiento es que [é]l pueda continuar rindiendo una buena labor en su trabajo sin que la problemática del terreno le est[é] afectando. Inicialmente se medicó con Ambien de 10 mgs. Para dormir y Buspar de 10 mgs. dos a tres veces al día de ser necesario para la ansiedad. Posteriormente, el Ambien se cambió a Doral de 15 mgs. al dormir, ya que alegaba tener un espacio de sueño muy corto."*

Alegato de la Parte Demandante-Apelado; Apéndice 14, pág. 2.

Ante todo lo anteriormente expuesto, no vemos porqué razón el Tribunal de Primera Instancia concluyó que los daños emocionales de Rivera Rivera no fueron apreciables. No podemos perder de perspectiva que en corte se testificó que dos psiquiatras evaluaron al demandante-apelado Rivera Rivera a raíz de la situación surgida por el tubo subterráneo que se descubrió en la propiedad de éste y el cual no aparece ni en los planos ni en el Registro de la Propiedad. Surge de la prueba testifical que Rivera Rivera no sólo tuvo que tomar terapias para su condición diagnosticada de "*trastorno de ansiedad depresivo*", sino que también tuvo que tomar

medicamentos para sus problemas de insomnio y falta de concentración. Entre los objetivos para el ofrecimiento del tratamiento estaba precisamente evitar que Rivera Rivera se convirtiera en una persona disfuncional. Se desprende entonces que la condición emocional de Rivera Rivera era real y apreciable.

Ya vimos que el tribunal apelado fijó sin cálculo pericial una indemnización por la alegada disminución de valor que la existencia de la servidumbre no aparente supone para el solar comprado. Sin embargo, aunque coincidimos con el demandado-apelante Durán Cruz en que el fundamento del Tribunal de Primera Instancia es erróneo, ello no es suficiente para revocar la sentencia. Recordemos que la apelación se da contra la sentencia y no contra sus fundamentos. *Piñeiro v. Int'l Air Serv. of P.R., Inc.,* 140 D.P.R. 343, 355 (1996); *Rodríguez v. Serra,* 90 D.P.R. 776 (1964). El tribunal apelativo sostendrá una sentencia que, aunque apoyada en un fundamento erróneo, se justifica por otros fundamentos jurídicos. *Pagán Navedo v. Rivera Sierra,* 143 D.P.R. 314 (1997).

Aclarado esto, concluimos que la prueba justifica una indemnización monetaria para compensar los daños morales que sufrió Rivera Rivera como consecuencia de todos los hechos antes expuestos en esta Sentencia. No podemos estar de acuerdo en que dichos daños no fueron apreciables, ya que como se testificó, los mismos tuvieron el efecto de afectar el estado anímico del demandante-apelado, Rivera Rivera.

Las partidas concedidas como indemnización por el Tribunal de Primera Instancia no serán alteradas en revisión, salvo que resulten ser totalmente inadecuadas e improcedentes, o como se ha dicho consistentemente, *"ridículamente bajas o exageradamente altas"*. *Quiñones López et. seq. v. Manzano Pozas et. seq.,* 141 D.P.R. 139 (1996). Por lo tanto, no intervendremos con el monto de la indemnización concedida por el Tribunal de Primera Instancia, ya que según la prueba, ésta no es exagerada como compensación por los daños emocionales sufridos.

## VIII

Por los fundamentos anteriormente expuestos, confirmamos la sentencia apelada.

Así lo acordó el Tribunal y lo certifica la Secretaria General.

Aida Ileana Oquendo Graulau
Secretaria General

### ESCOLIOS 2002 DTA 87

**1.** Véanse Determinaciones de Hechos Número 4, 10, 11 y 12.

**2.** Recuérdese que de haber estado inscrita la existencia de ese tubo y desagüe, el mismo hubiese constituido una servidumbre legal.