# 2006 DTA 22

KP2 27 2008

**TRIBUNAL DE CIRCUITO DE APELACIONES**
**REGIÓN JUDICIAL DE BAYAMÓN**
**PANEL VII**

FRANCISCO GUZMÁN SASTRE, VILMA ZORAIDA RAMOS, Y LA
SOCIEDAD LEGAL DE GANANCIALES COMPUESTA POR AMBOS
Apelados

v.

ÁNGEL LUIS MORALES RÍOS, Y SU ESPOSA FULANA DE TAL RÍOS Y LA SOCIEDAD DE BIENES
GANANCIALES COMPUESTA POR AMBOS
Apelantes

Núm. KLAN-05-00753

San Juan, Puerto Rico, a 2 de diciembre de 2005

Panel integrado por su Presidente, el Juez Arbona Lago,
el Juez Miranda De Hostos y la Juez Pabón Charneco

Pabón Charneco, Jueza Ponente

## TEXTO COMPLETO DE LA SENTENCIA

Comparece ante nos, Ángel Luis Morales Ríos, en adelante, el apelante, solicitando la revocación de una Sentencia dictada por el Tribunal de Primera Instancia, Sala Superior de Bayamón. Mediante dicho dictamen, el tribunal *a quo* declaró Con Lugar una demanda incoada por la parte apelada.

Por las razones que expresamos a continuación, se confirma la Sentencia apelada.

### I

Conforme surge del recurso ante nuestra consideración, el 10 de octubre de 2002, el apelado, su esposa Vilma Zoraida Ramos y la Sociedad de Bienes Gananciales compuesta por ambos incoaron una demanda sobre acción redhibitoria por vicio oculto de animales contra el apelante, █ su esposa Fulana de Tal Ríos y la Sociedad de Bienes Gananciales compuesta por ambos.

Se desprende de la demanda que para febrero de 2002, el apelado adquirió dos (2) ejemplares "*Caprichosa de 222*" █ y "*La Favorita*" propiedad del apelante. El precio pactado fue de veinte mil (20,000) dólares █ por cada uno. █ Saldada la deuda de la potranca "*Caprichosa de 222*", el apelado recogió la misma y se la llevó a las facilidades de cuido de sus animales. Posteriormente, y saldada la deuda de la potranca "*La Favorita*", se procedió a llevar la misma a la facilidad de cuido, a saber, el potrero Over Núñez en Vega Alta.

Se alegó que varios días después, y a raíz de una evaluación rutinaria que un veterinario contratado por el apelado le hace a la potranca "*La Favorita, éste se entera que el ejemplar tiene una condición llamada Belfa.* █ El apelado planteó que la potranca había sido comprada para fines de competir en los eventos de Paso Fino tanto nacional como internacional. En consecuencia, alegó que la condición la imposibilitaba de competir en eventos nacionales y algunos internacionales de Paso Fino por disposición reglamentaria. Por lo tanto, planteó que el ejemplar "*La Favorita*" no podía ser utilizado para el fin para el cual se había comprado. Le solicitó al foro de instancia declarara Con Lugar la demanda instada.

El apelante presentó alegación responsiva en marzo de 2003. Luego de varios trámites procesales, █ se señaló la Vista en su Fondo para los días 27 y 28 de septiembre de 2004.

Celebrada la vista del caso, y aquilatada la prueba pericial y testifical, el Tribunal de Primera Instancia emitió las siguientes determinaciones de hechos las que transcribimos *in extenso*:

"*1. Don Angel Luis Morales Ríos (apelante), después de estar en el Paso Fino desde el 1996, había*

castado varios animales de Paso Fino y en el 2002, tenía dos potrancas a la venta, una de nombre "Caprichosa de 222" y la otra "La Favorita". Ambas hijas de la yegua "Caprichosa de Piloto", siendo la primera hija del padrote "222" y la segunda del padrote "Capuchino".

2. Don Francisco Guzmán Sastre (apelado), por manifestaciones que le hiciera José Juan Rivera Larroy, pasó por las jaulas de don Angel Luis Morales Ríos (apelante), para ver estas potrancas. Entablaron negociaciones y se procedió a negociar la compra de ambas potrancas. Se estableció el precio de $20,000.00 por cada una de las potrancas.

3. El Sr. Francisco Guzmán (apelado), procede a adquirir ambas potrancas por la suma de $20,000.00, cada una, entregándoles inicialmente $30,000.00 al señor Morales (apelante), los cuales representaban el saldo total de la potranca "Caprichosa de 222" y un pago inicial de $10,000.00, por la potranca "La Favorita". El balance de los $10,000.00 adeudados se pagarían a razón de $2,000.00 mensuales en cinco meses, concediendo 30 días adicionales de gracia.

4. La potranca "Caprichosa de 222" es trasladada de las jaulas del señor Morales Ríos (apelante) a otras jaulas donde se continuó entrenando por el Sr. José Juan Rivera Larroy, quien desde antes la entrenaba.

5. La potranca "La Favorita", continúa en las jaulas del señor Morales Ríos (apelante) en donde el Sr. Francisco Guzmán (apelado) le pagaba $175.00 mensuales por el cuido.

6. Aunque las partes tienen versiones encontradas de la razón por la cual la potranca "La Favorita" permaneció en las jaulas del señor Morales Ríos (apelante), este Tribunal tiene que darle credibilidad a la versión del demandante, ya que el desarrollo de la negociación y pago da base para entender que la entrega del animal no se haría hasta el momento de su saldo final. Véase, que el señor Morales Ríos (apelante), alega que suscitaron situaciones con los cheques del demandante por fondos insuficientes, pero aún con este problema de pago, el señor Morales Ríos (apelante) retuvo la potranca "La Favorita", en exceso de los seis (6) meses pactados para el pago de la misma. No se entregó hasta ocho (8) meses después, octubre 26 del 2002, día en que se salda el balance de la compraventa. El día de la entrega se atrasó la misma por una disputa en cuanto a una deuda de cuido. Por esta razón, el Tribunal concluye que la tradición y/o entrega del objeto del Contrato de Compraventa ocurre el 26 de octubre del 2002.

7. Durante los ocho (8) meses que la potranca "La Favorita" estuvo en su la finca del señor Morales Ríos (apelante), el señor Guzmán Sastre (apelado), alega que la vio una vez cada dos meses. El testimonio del señor Morales Ríos (apelante), es que el señor Guzmán Sastre (apelado), visitaba su finca para ver la potranca "La Favorita" mensualmente. En vista de ello, el Tribunal concluye que durante este término de aproximadamente ocho (8) meses que la potranca "La Favorita" estuvo en la finca del Señor Morales Ríos (apelante), el señor Francisco Guzmán (apelado), la vio entre cuatro (4) a ocho (8) ocasiones.

8. La potranca "La Favorita", según su certificado de registro, nació el 7 de agosto del 2001, por lo que para el mes de febrero de 2002, tenía aproximadamente seis (6) meses de edad.

9. El señor Morales Ríos (apelante), reconoce que la potranca "La Favorita" le fue inspeccionada su boca al nacer y se continuó periódicamente inspeccionando el área de la boca y quijada por el demandado y otros. Ante esta prueba, el Tribunal concluye que el demandado Angel Luis Morales Ríos (apelante), y sus empleados, quienes atendían y cuidaban cotidianamente la potranca "La Favorita", y según sus dichos la inspeccionaba periódicamente, estaban en mejor posición para detectar un defecto en la dentición de dicha potranca que el demandante señor Guzmán Sastre (apelado).

10. La prueba pericial de la parte demandante Dr. Rafael Corretjer, así como la prueba pericial de la

*parte demandada Dr. Angel Jiménez, ante fotos enseñadas, concluyeron que la potranca "La Favorita", padece de una condición en la dentición conocida como "Belfa". Dicha condición resulta en el equino cuando la mandíbula es más larga que la maxila. Ello provoca una mala oclusión de la mordida, ya que los dientes inferiores sobrepasan a los dientes superiores.*

*11. La condición de "Belfa" es de acuerdo a los distintos reglamentos presentados, así como el propio testimonio de ambos peritos, descalificante; entiéndase, no puede competir en dichas entidades de tener esta condición. Existen entidades donde si pueden competir, pero éstas son de una segunda categoría en este deporte.*

*12. La condición de "Belfa", además, limita su utilización para la recría, ya que es un defecto transmisible, cual también fue discutido por los peritos veterinarios.*

*13. El señor Morales Ríos (apelante), en su testimonio establece que la madre de las potrancas "Caprichosa de Piloto, le constó $50,000.00 y fue comprada para la recría y competencia de Paso Fino y con estos propósitos específicos la había adquirido. Que la había competido en las mejores entidades de Puerto Rico. Igual intención e interés tuvo el señor Guzmán Sastre (apelado) al adquirir las dos potrancas para dedicarlas a la competencia en el Deporte de Paso Fino y, además, a la recría.*

*14. El Tribunal concluye que la potranca "La Favorita" adolecía de un defecto conocido por "Belfa", lo cual la hacía impropia para el uso a que se interesaba destinar en las competencias y que disminuia su valor de manera sustancial para el uso de recría.*

*15. Los peritos veterinarios establecieron que la condición es una que, aunque en ocasiones se puede detectar en los potrillos, por lo general se desarrolla con el tiempo. La identificación de la condición depende de la protuberación de los dientes, mientras más protuberantes, más temprano en edad puede ser identificado.*

*16. La condición de "Belfa", por entenderse de origen genético, está en el animal desde su concepción.*

*17. Como consecuencia, entendemos que el demandante Sr. Francisco Guzmán Sastre (apelado), de haber conocido la condición de "Belfa" existente en la potranca "La Favorita", no hubiera adquirido la misma. "La Favorita" es entregada al señor Guzmán Sastre (apelado) el 26 de octubre del 2002 y ya para noviembre del mismo año y, según las propias manifestaciones del demandado, se le estaba reclamando por el defecto de la potranca.*

*18. El Sr. Francisco Guzmán Sastre (apelado), durante todo este tiempo ha mantenido la potranca "La Favorita", en cuido de jaula; pagando $175.00 mensuales al señor Morales Ríos (apelante). Durante los ocho (8) meses que retuvo la potranca, y a razón de $150.00 mensuales de ahí en adelante. Cómputo de fácil disposición. Ha tenido gastos adicionales de herrero que según sus dichos ascendían a $60.00 por visita y éstas se efectuaban entre dos (2) a (3) meses, por lo que dicho gasto se estima en $240.00 al año. Gastó, además, en vacunas $75.00, así como $100.00 al año en sacos de vitaminas de 25 libras. Siendo éstos los gastos que probara el demandante."*

Véase, Exhibit B del Apéndice.

Ante lo anterior, el Tribunal de Primera Instancia determinó, entre otros extremos, que la tradición o entrega del objeto del contrato había ocurrido el 26 de octubre de 2002. En base a toda la prueba presentada, el tribunal *a quo* concluyó que eran de aplicación al caso las disposiciones del Código Civil en materia de Contratos de Compraventa, en particular los artículos que disponen sobre el saneamiento por defectos o gravámenes ocultos. En vista de tales determinaciones, declaró Con Lugar la demanda rescindiendo el contrato y ordenó la

devolución de la potranca *"La Favorita"* al apelante y condenó a éste a devolver la cantidad de veinte mil (20,000) dólares que le fueron pagados por el ejemplar. A su vez, declaró No Ha Lugar la reconvención instada por el apelante.

Insatisfecho con el dictamen emitido, el apelante acude ante nos. Contando con la Exposición Narrativa de la Prueba y el alegato del apelado, procedemos a resolver.

## II

En su escrito, el apelante plantea que incidió el Tribunal de Primera Instancia al hacer sus determinaciones de hechos puesto que la causa de acción estaba prescrita por haberse ejercitado fuera del término establecido por ley; y al dictar una Sentencia que no es cónsona con la prueba desfilada ante su consideración.

## III

El Art. 1350 del Código Civil, 31 L.P.R.A. sec. 3810, establece que entre las responsabilidades que asume el vendedor en un contrato de compraventa está la de la entrega y el saneamiento de la cosa objeto del contrato. En virtud del saneamiento, el vendedor responde al comprador de la posesión legal y pacífica de la cosa vendida, así como de los defectos o vicios ocultos que tuviere la cosa vendida. El comprador adquiere la cosa para utilizarla según mejor lo estime y esa finalidad se vería malograda si entregado el objeto, su adquirente se viera privado de la cosa o simplemente no pudiera aplicarla a los usos a los que la había intencionado. *Polanco López v. Cacique Motors,* ___ D.P.R. ___ (2005), **2005 JTS 101**, citando a I. Sierra Gil de la Cuesta, *Comentario del Código Civil,* Tomo 7, Editorial Bosch, España, 2000, a la pág. 391.

La acción de saneamiento es una acción especial propia de los Contratos de Compraventa que refleja la obligación del vendedor de garantizar al comprador el uso y disfrute de la cosa objeto del contrato. Dicha acción presenta dos (2) modalidades, a saber, el saneamiento por evicción y el saneamiento por vicios ocultos en la cosa. *Márquez v. Torres Campos,* 111 D.P.R. 854 (1982).

A su vez, el saneamiento por vicios ocultos en la cosa tiene dos (2) vertientes por las cuales el comprador puede optar: la acción redhibitoria y la estimatoria *(quanti minoris).* La acción estimatoria le provee al comprador la opción de recibir una rebaja en el precio pagado en atención a la disminución de valor que ocasionó el defecto. Por otro lado, y a través de la acción redhibitoria, el comprador rescinde el contrato, devuelve el objeto de la compra y recibe el precio pagado. En adición, puede obtener indemnización de daños si el vendedor conocía el vicio. Art. 1375 del Código Civil, 31 L.P.R.A. sec. 3843.

El Art. 1373 del Código Civil, 31 L.P.R.A. sec. 3841, dispone, entre otros extremos, que un vendedor estará obligado al saneamiento por los defectos ocultos que tuviere la cosa vendida, si la hace impropia para el uso a que se la destina o si disminuyen de tal modo este uso que, de haberlos conocido el comprador, no la habría adquirido o habría dado menos precio por ella. Este mismo precepto hace la salvedad de que el vendedor no sería responsable de los defectos manifiestos o que estuvieren a la vista, ni tampoco de los que no lo estén, si el comprador es un perito que, por razón de su oficio o profesión, debía fácilmente conocerlos.

A tales efectos, para que proceda una acción por vicios ocultos, el comprador tiene que probar ciertos requisitos, a saber:

*"a. que se trata de un defecto oculto;*

*b. que desconocía su existencia;*

*c. que el mismo es nocivo a la utilidad de la cosa y de suficiente gravedad o importancia que hacen la misma impropia para el uso que se le destinó o disminuyen de tal manera ese uso que, de haberlo conocido, no*

*hubiese adquirido la cosa;*

*d. que sea preexistente a la venta; y*

*e. que se ejercite en el plazo legal de seis (6) meses a partir de la entrega de la cosa vendida."*

*Ferrer v. General Motors Corp.,* 100 D.P.R. 246 (1971).

El Código Civil va más allá y regula, además de la acción de saneamiento por vicios en general, los vicios ocultos en animales. Arts. 1380, 1382-1388 del Código Civil, 31 L.P.R.A. sec. 3848, secs. 3850-3856. En tales casos, la acción de saneamiento se debe presentar en el término de cuarenta (40) días. Art. 1379 del Código Civil, 31 L.P.R.A. sec. 3847.

El Código Civil dispone que la acción redhibitoria que se funda en los vicios o defectos de los animales deberá interponerse dentro de cuarenta (40) días, contados desde la entrega al comprador, salvo que por el uso en cada localidad se hayan establecidos mayores o menores plazos. Art. 1385 del Código Civil, 31 L.P.R.A. sec. 3853.

Por otra parte, el Tribunal Supremo ha pronunciado que la institución de la prescripción extintiva aspira a asegurar la estabilidad de la propiedad y la certidumbre de los demás derechos. *Agulló v. ASERCO,* 104 D.P.R. 224, 248 (1975). Su innegable necesidad y valor responden a una presunción legal de abandono derivada del hecho del transcurso de un tiempo determinado sin reclamar un derecho. *Eisele v. Orcasitas,* 85 D.P.R. 85, 93 (1962).

Los términos que provee la ley pueden ser interrumpidos siempre y cuando se cumplan con ciertos requisitos establecidos por el Tribunal Supremo, a saber:

*"a. la oportunidad o tempestividad, que requiere que el ejercicio de la acción debe realizarse antes de la consumación del plazo;*

*b. la legitimación, según la cual el ejercicio corresponde al titular del derecho o acción;*

*c. identidad, que consiste en que la acción ejercitada ha de responder exactamente al derecho que está afectado por la prescripción; y*

*d. Idoneidad del medio utilizado."*

Una reclamación extrajudicial puede plasmarse a través de distintos actos, pero todos ellos han de cumplir con los requisitos genéricos de oportunidad, identidad, legitimación e idoneidad antes reseñados. *Galib Frangie v. El Vocero,* 138 D.P.R. 560, 566 (1995).

El acto interruptivo representa la manifestación inequívoca de una voluntad contraria al mantenimiento de la situación inerte manifestada ésta con anterioridad a que el plazo de deliberación se agote. Una vez se da ese acto que interrumpe el término para ejercitar la acción, el mismo comienza a cursar nuevamente. *García Aponte v. E.L.A.,* 135 D.P.R. 137 (1994).

## IV

Dentro del marco jurídico antes enunciado, procedamos a resolver la controversia ante nuestra consideración.

En su escrito, el apelante plantea que el término para instar la acción de saneamiento por vicios ocultos estaba prescrita, toda vez que el contrato quedó vigente para el mes de febrero de 2002 y la demanda incoada data del 10 de diciembre de 2002. Fundamenta su posición en el hecho de que el contrato se consumó al momento mismo de suscribirse y que la primera manifestación que le hiciera por carta el apelado se hizo fuera del término prescriptivo para establecer reclamaciones por vicios ocultos. Dicha misiva fue a mediados del mes de noviembre de 2002. Entiende que, contrario a lo resuelto por el Tribunal de Primera Instancia, la entrega de la cosa, a saber, la potranca *"La Favorita"*, se efectuó en febrero de 2002 y no en octubre 26 de 2002.

Hemos evaluado los argumentos esbozados y somos de opinión, al igual que el tribunal *a quo*, que la entrega de la cosa objeto del Contrato de Compraventa, se dio con la entrega física del ejemplar *"La Favorita"* el 26 de octubre de 2002.

El Código Civil dispone que se entenderá entregada la cosa vendida cuando se ponga en poder y posesión del comprador. Art. 1351 del Código Civil, 31 L.P.R.A. sec. 3811. El Tribunal Supremo ha resuelto que para que pueda entenderse transmitido el dominio es necesario que se configure la tradición, que consiste en la entrega de la posesión de la cosa con ánimo del que da y del que recibe de transmitir y adquirir, respectivamente, el derecho que tenga sobre ella. *H.R. Elec. Inc. v. Rodríguez,* 114 D.P.R. 236 (1983).

Conforme a lo anterior, la entrega de la cosa en este caso ocurrió en el mes de octubre y es desde ese momento en que comenzó a transcurrir el término para ejercitar la acción de saneamiento. Surge de la prueba que el apelante estableció como condición que hasta que no se pagara la potranca *"La Favorita"*, no se entregarían los papeles de la misma, ni se efectuaría el traspaso ni se podía sacar de la jaula al animal. (Véase, pág. 9 de la Exposición Narrativa de la Prueba), ■ Lo anterior fue corroborado por el testimonio del apelado a efectos de que no podía llevarse a la potranca porque *"la debía"*. De hecho, los papeles de la potranca *"La Favorita"* no le fueron entregados hasta el día de su saldo. (Véase, pág. 15 de la Exposición Narrativa de la Prueba)

Por otro lado, se desprende del expediente que para el mes de noviembre, antes de que se cumpliesen los cuarenta (40) días requeridos por el ordenamiento jurídico para ejercer la acción, el apelado le comunicó, vía carta, al apelante sobre la condición del ejemplar. En ese momento, se interrumpió el término prescriptivo para incoar la acción. La demanda fue instada el 10 de diciembre del 2002 por lo que la misma se tramitó dentro del término de los cuarenta (40) días requeridos desde la entrega de la potranca *"La Favorita"*.

Por otro lado, el ejercicio del derecho a una acción redhibitoria por vicios ocultos en animales se debió a que el ejemplar vendido al apelado adolecía de una condición que lo imposibilitada para el uso al que iba ser destinado, condición que, de haber sido conocida, hubiese impedido la celebración del negocio jurídico entre las partes. No hay controversia en que se deseaba que la potranca *"La Favorita"*, quien se compró a los seis (6) meses de edad, compitiera en eventos de Paso Fino. Lo anterior cumple con los requisitos establecidos en el Código Civil para que se pueda llevar una acción de saneamiento de esta índole.

Se desprende de la Exposición Narrativa de la Prueba que los peritos que testificaron sobre la condición *"Belfa"*, concurrieron en que la misma lo imposibilitaba para participar en competencias del deporte de Paso Fino, razón por la cual el apelado adquirió al ejemplar. A su vez, manifestaron que a este tipo de ejemplares no se les considera para la recría, ya que la condición es una hereditaria. El ejemplar no era de utilidad para el propósito para el cual se había adquirido a causa de un vicio oculto.

Por otro lado, el apelante nos alega que incidió el Tribunal de Primera Instancia al dictar una Sentencia que no es cónsona con la prueba desfilada.

Es norma claramente establecida por el Tribunal Supremo de Puerto Rico que en ausencia de error

manifiesto, pasión, prejuicio o parcialidad no se intervendrá a nivel apelativo con las determinaciones de hechos y adjudicación de credibilidad hecha en instancia por el juzgador de los hechos. *Argüello López v. Argüello García*, res. el 31 de agosto de 2001, **2001 JTS 127**; *Trinidad v. Chade*, res. el 18 de enero de 2001, **2001 JTS 10**; *Quiñones v. Manzano*, 141 D.P.R. 139 (1996); *Orta v. Padilla*, 137 D.P.R. 927 (1995); *Vélez v. Srio. de Justicia*, 115 D.P.R. 529 (1984); *Ortiz v. Cruz Pabón*, 103 D.P.R. 939 (1975); *Rodríguez v. Concreto Mixto, Inc.*, 98 D.P.R. 579 (1970).

Un foro apelativo no puede descartar y sustituir por sus propias apreciaciones, basadas en un examen del expediente del caso, las determinaciones tajantes y ponderadas del foro de instancia. *Argüello v. Argüello, supra*. La determinación de credibilidad del tribunal sentenciador es merecedora de gran deferencia por parte del tribunal apelativo por cuanto es ese juzgador quien, de ordinario, está en mejor posición para aquilatar la prueba testifical desfilada, ya que él fue quien oyó y vio declarar a los testigos. *Id.; Pueblo v. Bonilla Romero*, 120 D.P.R. 92 (1987). El juez sentenciador, ante quien deponen los testigos, es quien tiene la oportunidad de verlos y observar su manera de declarar, de poder apreciar sus gestos, titubeos, contradicciones, manerismos, dudas, vacilaciones y, por consiguiente, de ir formando gradualmente en su conciencia la convicción en cuanto a si dicen la verdad. *Argüello v. Argüello, supra*.

"*[L]a declaración de un testigo no contradicho sobre un hecho determinado, debe merecer crédito, a no ser que su versión sea físicamente imposible, inverosímil o que por su conducta en la silla testifical se haga indigno de crédito*". *Miranda Soto v. Mena Eró*, 109 D.P.R. 473 (1980); *Alicea v. Sucn. F. Gil Rivera*, 87 D.P.R. 789 (1963); *Villaronga, Com. v. Tribl. de Distrito*, 74 D.P.R. 331 (1953).

Aunque, de ordinario, el foro apelativo no interviene con la apreciación de la prueba que hacen los tribunales de instancia, sí lo hace cuando un balance racional, justiciero y jurídico de la totalidad de la prueba y de los documentos que obran en autos lleva a conclusiones distintas a las del tribunal de instancia. *Negrón Rivera y Bonilla, Ex Parte*, 120 D.P.R. 61 (1987).

Un tribunal apelativo no puede dejar sin efecto una sentencia cuyas conclusiones encuentran apoyo en la prueba desfilada. *Sánchez Rodríguez v. López Jiménez*, 116 D.P.R. 172, 181 (1985); *Pérez v. Hosp. La Concepción*, 115 D.P.R. 721, 728 (1984). No obstante, está claro que el arbitrio del juzgador de hechos es respetable, mas no absoluto. Por eso, una apreciación errónea de la prueba no tiene credenciales de inmunidad frente a la función revisora de un tribunal apelativo. Véase, *Rivera Pérez v. Cruz Corchado*, 119 D.P.R. 8 (1987); *Vélez v. Srio. de Justicia, supra*.

Al discutir el segundo error, el apelante no nos coloca en posición de resolver que el tribunal *a quo* incurrió en pasión, prejuicio, parcialidad o error manifiesto, por lo que este Tribunal no intervendrá con la apreciación de la prueba. Tampoco ha demostrado que la determinación del Tribunal de Primera Instancia fuese una arbitraria o irrazonable.

A la luz de la normativa antes esbozada, tenemos que concluir que, en ausencia de error manifiesto, pasión, prejuicio o parcialidad al apreciar la prueba, es menester no intervenir con las determinaciones de hechos, la apreciación de la prueba y la adjudicación de credibilidad efectuada por el juzgador de los hechos. La detenida lectura de los testimonios vertidos en la vista celebrada por el foro de instancia y las determinaciones de hechos recogidas, no nos mueven a intervenir en estas últimas por ser claras, específicas y cónsonas con la prueba presentada.

## V

Por los fundamentos antes expuestos, se confirma la Sentencia apelada.

Así lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Laura M. Vélez Vélez
Secretaria del Tribunal de Apelaciones